## No. 8938.

DENVER & SALT LAKE RAILROAD COMPANY *v.* CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY ET AL.

1. UTILITIES COMMISSION—*Review of Orders.* Under sec. 52 of c. 127 of the laws of 1913 the review in this Court of the orders of the Public Utilities Commission is controlled by the considerations applying in other cases, except as otherwise provided by the act.

This court must determine whether the order of the Commission in question is just and reasonable, and supported by competent evidence heard by that body. This duty the court cannot escape.

The court is not, however, to overrule the order of the Commission where there is a substantial conflict in the testimony. The deductions of witnesses from the testimony, are not, in themselves testimony, and conflicts in such deductions are not considered.

2. —— *Power of the Court.* The court is without authority to prescribe in detail the rate, or division of the rate, to be charged by the several companies participating in the service. Sec. 52 of the statute simply authorizes it to affirm, vacate, or modify the order of the commission.

3. EVIDENCE—*Judicial Notice*, will not be taken of the records of the Utilities Commission.

4. UTILITIES COMMISSION—*Considerations Controlling Its Decisions.* The Commission is without authority in fixing railway rates, to take into account rates of which no evidence was offered.

Though the law imposes upon the Commission the duty to keep itself advised of the condition of the railway service, they are not to take this knowledge into account in deciding controversies as to divisions of the through rate, between the carriers participating in the service.

Where the Commission reduces the rates for the carriage of a commodity over different lines, inequalities in former divisions are not to be perpetuated.

That one of the several roads participating in the carriage, has, acting under compulsion, accepted an unreasonable share of the previous through rate does not warrant the continuation of this unreasonable division.

The strategic position of a railway may in the matter of the division of a through rate, be considered, but it is not the controlling factor.

A railway which carries a coal for which there is an increasing demand, should not be discriminated against because this article is produced upon its lines. It is of public interest that such coal should move freely to the regions where it is demanded.

Where several companies participate in the carriage of a commodity produced upon one of them, the whole line of which is within the state, the number of cars furnished by the other companies is not to be considered in fixing the division of the through rate, where there is no testimony as to the number of cars furnished for the traffic within the state, or the number furnished for the carriage to points beyond the state.

A reasonable division of a joint rate is not to be denied to one of those engaged in the service because of derelictions, past, present, or anticipated.

A company having no terminal facilities at the point where it delivers freight to other companies participating in the through

carriage must pay the customary reasonable charge made for switching by other companies.

If an excessive charge is made for this service the company aggrieved is not to retire from the service, but to apply to the Commission for relief.

*Error to the Public Utilities Commission.*

Mr. TYSON S. DINES, Mr. TYSON DINES, JR., Mr. CARLE WHITEHEAD, Mr. ALBERT L. VOGEL, for petitioner.

Mr. E. E. WHITTED, Mr. T. M. STUART, JR., Mr. WILLIAM V. HODGES, Mr. WALLACE T. HUGHES, Mr. D. EDGAR WILSON, Mr. HAROLD H. HEALY, Mr. C. C. DORSEY, Mr. JOHN Q. DIER, for respondents.

Chief Justice Hill delivered the opinion of the court.

THIS action is to review an order of our Public Utilities Commission fixing a division or apportionment of through rates on coal to be shipped from points in northwestern Colorado, known as the Oak Hills district, on the road of the petitioner to points in the eastern part of the state on the roads of the respondents. (2 Colo. P. U. C. Rep. 8.) For convenience, the petitioner, The Denver & Salt Lake Railroad Company will be called "the Moffat road"; the respondent, The Chicago, Burlington & Quincy Railroad Company "the Burlington"; The Union Pacific Railroad Company, "the Union Pacific;" the Chicago, Rock Island and Pacific Railway Company and its Receiver, "the Rock Island;" and our Public Utilities Commission, "the Commission."

The record discloses, that on January the 11th, 1915, the Commission instituted, on its own motion, an investigation into the rates charged on coal between these and other points in the state; that, on May 10th following, it announced its opinion, and entered its order. (1 Colo. P. U. C. Rep. 48.) By this order, it required the carriers, who are parties to this action, to establish new rates for the transportation of coal between the points above referred to, which new rates as a whole were materially lower than the former ones, varying from no change at a few

points, to as high as thirty per cent. reduction, to others, probably an average reduction of at least ten per cent., the exact amount being immaterial so far as this controversy is concerned. The carriers being unable to agree upon a division of the new rates, the Moffat road appealed to the Commission to decide it. Its decision was that as between the Moffat, the Burlington and the Union Pacific the new rates should be divided in the same proportion as the former, each bearing its proportion of the reduction in proportion to what its proportion of the old rate bore to the whole; that as between the Moffat and the Rock Island, the divisions should be similar to those on the other roads, which were different than the former divisions between them. The Moffat road brings the case here for review and contends, that the divisions for it are unjust, unreasonable and contrary to the evidence, and that there is no testimony to sustain the justness of the order.

The respondents contend, that this court is without jurisdiction to interfere in the respect complained of; that the fixing of the divisions is along the same line as the establishment of reasonable rates, and is legislative in character; that this prohibits a review of that question by this court; that it is the exercise of an authority which the law vests in the Commission, viz., the determination of a question of fact, and that any attempt to provide for a review by a court and for its final determination of the matter would be unconstitutional, as giving to the judiciary non-judicial powers; that the courts must not usurp administrative orders on their own conception of their wisdom; that, in any event, the questions of divisions are questions of fact, which were determined upon conflicting evidence, hence, cannot be disturbed.

The principles upon which courts act in such cases and their jurisdiction are well settled. All such acts, so far as we are advised, including those involving the Interstate Commerce Commission, provide for review by the courts. No case has been cited which holds that similar provisions providing for review are for that reason invalid. The de-

batable question is the scope and extent of the review, and the court's judgment in connection with it. Section 52 (p. 497-498, Laws, 1913) of our act provides for a review by this court, for the purpose of having the lawfulness of the Commission's order inquired into and determined. It provides that no new additional evidence may be introduced in the Supreme Court, but the case shall be heard on the record of the Commission as certified by it. It further provides that the review shall not extend further than to determine whether the Commission has regularly pursued its authority, including a determination of whether the order of decision under review violates any right of the petitioner under the Constitution of the United States, or of the state of Colorado, and whether the order of the Commission is just and reasonable, and whether its conclusions are in accordance with the evidence. It also provides that the findings and conclusions of the Commission on disputed questions of fact shall be final, and shall not be subject to review; also that upon hearing the Supreme Court shall enter judgment either affirming, setting aside, or modifying the order or decision of the Commission. Section 53 provides that pending a review, this court may stay or suspend, in whole or in part, the operation of the Commission's order on certain conditions, etc.

It will thus be observed, that, among other things, the act requires this court to determine whether the order of the Commission is just and reasonable, and whether its conclusions are in accordance with the evidence.

This language assumes, as other parts of the act provide that the Commission will take testimony, and base its decision thereon, and that on review, the testimony will be made a part of the record for consideration by this court. Section 52 further provides that the provisions of our code of civil procedure, relative to rights of review, shall, so far as applicable, and not in conflict with the provisions of this act, apply to proceedings had in this court under the provisions of this section. When these sundry provisions are considered together, it follows that our reviews

of such cases was intended to be the same as in other cases between litigants except as otherwise provided or limited in the act.

Counsel for respondents contend that the question of a reasonable division of rates is a question of fact, and that as section 52 of the act prohibits us from reviewing any question of fact based upon conflicting testimony, we are without jurisdiction to go into that question. In order to properly construe this paragraph, it should be considered in connection with those immediately preceding it. They provide that we shall determine whether the order of the Commission is just and reasonable, and whether its conclusions are in accordance with the evidence. When they are read together, we agree that our duties in so far as this phase of the contention is concerned, are controlled and limited by them. We cannot agree, however, that they prohibit us from considering the evidence in order to ascertain from it, which the act says we shall do, whether the order is just and reasonable, and whether the Commission's conclusions are in accordance with the evidence. This includes whether there is a substantial conflict in the evidence which, if there is, we agree would prohibit us from overruling the Commission's findings based thereon. Our conclusions in this respect are supported by the highest court in the land.

In *Interstate Commerce Commission v. Louisville Nashville Railroad Company,* 227 U. S. 88, 57 L. ed. 431, 33 Sup. Ct. 185, the court had under consideration an order of the Interstate Commerce Commission reducing rates. In discussing its powers to review such orders, the court, at page 91, said:

"In the comparatively few cases in which such questions have arisen it has been distinctly recognized that administrative orders, quasi-judicial in character, are void if a hearing was denied; if that granted was inadequate or manifestly unfair; if the finding was contrary to the 'indisputable character of the evidence.' * * * or, if the facts found do not, as a matter of law, support the order made.

* * * In a case like the present the courts will not review the Commission's conclusions of fact * * * by passing upon the credibility of witnesses, or conflicts in the testimony. But the legal effect of evidence is a question of law. A finding without evidence is beyond the power of the Commission. An order based thereon is contrary to law and must, in the language of the statute, 'be set aside by a court of competent jurisdiction.' "

To the same effect is *Interstate Commerce Commission v. U. P. R. R. Co. et al.*, 222 U. S. 541, 56 L. ed. 308, 32 Sup. Ct. 108. In *Louisville & N. R. Co. et al. v. United States et al.*, 216 Fed. 672, in commenting upon the same question, at page 679, the court said:

"Accordingly it is well settled that where all the evidence introduced before the Commission is exhibited to the court, its conclusion of fact that a given rate is reasonable or unreasonable, will be accepted by the court as final and not reviewed upon the weight of the evidence, unless either there is no substantial evidence supporting such conclusion or such conclusion is contrary to the indisputable character of the evidence; in which cases the conclusion involves an error of law and is therefore reviewable by the court."

In *Louisville & N. R. Co. v. United States*, 227 Fed. 258, at page 262, the court says:

"It is well settled, on the one hand, that a conclusion of the Commission upon a question of fact, such as the reasonableness of a rate or the giving of a preference, whose correctness depends wholly upon a consideration of the weight to be given evidence before it, will not be reviewed by the court; and, on the other hand, that a conclusion which plainly involves under the undisputed facts, an error of law, or which is shown to be supported by no substantial evidence or to be contrary to the indisputable character of the evidence, thereby likewise involving an error of law, will be so reviewed."

In *State v. Great Northern Ry. Co.*, 130 Min. 57, 61, 153 N. W. 247, Ann Cas., 1917 B, 1201, in passing upon this

phase of their statute, the Supreme Court of Minnesota, at page 248, says:

"The order may be vacated as unreasonable if it is contrary to some provision of the federal or state Constitution or laws or if it is beyond the power granted to the Commission, or if it is based on some mistake of law, or if there is no evidence to support it, or if, having regard to the interest of both the public and the carrier, it is so arbitrary as to be beyond the exercise of a reasonable discretion and judgment."

In *Louisiana & P. Ry. Co. et al. v. United States et al.,* 209 Fed. 244, in referring to a finding of the Interstate Commerce Commission, the court, at page 250, says:

"Whether or not this is a justifiable finding of fact is to be determined, in the first instance, by the Interstate Commerce Commission. When, as in these cases, a full and fair hearing has been granted, the Commission's findings of fact are subject to review in this court only upon an allegation that they are not sustained by any substantial evidence in the record before it or are arbitrary in being based upon improper distinctions and considerations."

This opinion was approved by the Supreme Court of the United States in *Tap Line Cases,* 234 U. S. 1, 58 L. Ed. 1185, 34 Sup. Ct. 741. While these cases apply to orders fixing rates, the same rule follows in division cases; the federal courts have thus applied them in reviewing such cases. *Louisiana & P. Ry. Co. et al. v. United States, supra; O'Keefe v. The United States,* 240 U. S. 294, 60 L. Ed. 651, 36 Sup. Ct. 313.

The rule pertaining to reviews in the cases quoted from are applicable here, and call for a consideration of the evidence in order to determine whether there is competent testimony to support the findings of the Commission and whether the Commission's order is just and reasonable. This, the statute says we shall do; hence is a duty which we cannot escape.

*C., R. I. & P. R. Co. v. Nebraska State Railroad Com-*

*mission et al.*, 85 Nebr. 818, 124 N. W. 477, 26 L. R. A. (N. S.) 444, relied on by respondents, does not sustain their position. So far as applicable, it is in harmony with the views herein expressed. The Nebraska statute provides for appeals from the Commission to the District Court with a proviso:

"In all trials under the foregoing article, the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the * * * orders * * * complained of are unreasonable and unjust to it."

It further provides that the Commission's order

"Shall, when properly authenticated * * * be received in evidence in the trial of said cause, that said * * * order * * * is *prima facie* just and reasonable."

Upon review, the Supreme Court said:

"Under all the facts in evidence, and giving the statutory presumption proper weight, we are satisfied that the order of the commission is not unreasonable, and the judgment of the district court so finding is affirmed."

This holding is to the effect that the testimony was sufficient to support the finding of the District Court.

The Moffat road claims that the conclusions of fact which the Commission arrived at, as set forth in its opinion, do not, as a matter of law, support the order made; that the Commission's order is not only not supported by the evidence, but is contrary to its legal effect. We have given the testimony careful consideration, and find no real conflict in it. It is not claimed that there is, upon any question of fact, such as locations of mines, quality of coal, prior business markets, roads, distances, tonnage, amounts carried, equipments of the different roads, proportion of cars furnished for the coal business, cost of carriage, rates heretofore charged by these and other roads, divisions thereof, agreements pertaining thereto, distances in connection therewith, local rates east and west, hauls on all lines, difference in cost of hauls, empties hauled and furnished and all other such facts. The conflict, if any, is in the conclusions drawn therefrom by the witnesses, which, in-

stead of being testimony, is simply their deductions as to the legal effect of the evidence concerning the real facts, which are not in dispute. These deductions were for the Commission to make, and are questions of law rather than of fact. We admit that there is a conflict in the deductions of these different witnesses. For example, one testified that Interstate Commerce Commissioner Clark had characterized divisions as a matter of barter and trade; for this reason, certain deductions follow that because certain rates at certain places had once been approved by the Interstate Commerce Commission, that certain conclusions should follow here. Another testified that because certain originating carriers had accepted lower proportions in order to assist them to find markets not on their lines, that certain conclusions should follow in this case. Such matters were but reasons or arguments as to what they thought ought to follow. When it came to testimony of existing facts pertaining to rates, divisions upon other roads, the custom concerning such matters, etc., there was no dispute.

In *Interstate Commerce Commission v. Union Pacific R. Co.*, 222 U. S. 541, 56 L. Ed. 308, 32 Sup. Ct. 108, it is said:

"Neither can any specific effect be given to the statement of witnesses that the 40-cent rate was low. The reasonableness of rates cannot be proved by categorical answers, like those given, where a witness may, in terms, testify that the goods were worth so much per pound, or the services worth so much a day. Too many elements are involved in fixing a rate on a particular article, over a particular road, to warrant reliance on such method of proof. The matter has to be determined by a consideration of many facts."

This declaration is likewise applicable to the question of a division of rates. It is undisputed that between Oak Hills and Denver the Moffat road crosses the continental divide at an altitude of 11,660 feet, with twenty-eight miles of four per cent grade, sixteen ascending from the west,

and twelve descending; that the topography of the country through which it runs is almost entirely mountainous, with sharp curves, excessive grades and high altitude; that, for these reasons (and the Commission so found) its operating conditions are more difficult and expensive than on the lines of the respondents, to the towns upon the prairie country east of Denver. It was also shown, that the westbound movement into Colorado on respondents' lines was much heavier than the eastbound movement, outside the coal traffic, and that the coal movement east over them furnished loads to many cars which, at times, would otherwise have to go back empty; that the principal traffic on the Moffat road is coal for Denver, and the east; that this necessitates the hauling of a large number of cars west from Denver to Oak Creek empty, which adds materially to its cost in the transportation of coal the other way. It is also agreed, that the average distance from Oak Hills coal district on the Moffat road to Utah Junction, is two hundred twelve miles; that from this point the Moffat road, out of its divisions, absorbs a switching charge for delivery to the Union Pacific, and the Rock Island of twenty cents a ton, yet regardless of all of these facts the Commission awarded to the respondents' roads a much greater portion of the through rate per mile, than it allowed to the Moffat road, being an average of nearly twice as much. To illustrate, the divisions on lump coal (the others being similar in proportion), to which we will add the equivalent per ton per mile in cents allowed each road, to ten out of some sixty-five stations on the Burlington (the divisions to the remainder being fixed on the same basis), are as follows. Derby, distance from Utah Junction ten miles, through rate $1.90 per ton, Moffat's portion $1.50 per ton, equivalent to .71 cents per ton per mile, Burlington's portion 40 cents per ton, equivalent to 4 cents per ton per mile; Barr twenty-two miles, through rate $2.00 per ton, Moffat's portion $1.303 per ton, equivalent to .61 cents per ton per mile, Burlington's portion 69.7 cents per ton, equivalent to 3.17 cents per ton per mile; Hudson, thirty-four miles, through

rate $2.10 per ton, Moffat's portion $1.26 per ton, equivalent to .59 cents per ton per mile, Burlington's portion 84 cents per ton, equivalent to 2.47 cents per ton per mile; Wiggins, sixty-eight miles, through rate $2.40 per ton, Moffats' portion $1.241 per ton, equivalent to .59 cents per ton per mile, Burlington's portion $1.159 per ton, equivalent to 1.70 cents per ton per mile; Akron, one hundred sixteen miles, through rate $2.85 per ton, Moffat's portion $1.296 per ton, equivalent to .61 cents per ton per mile, Burlington's portion $1.554 per ton, equivalent to 1.34 cents per ton per mile; Schramm, one hundred forty-eight miles, through rate $3.15 per ton, Moffat's portion $1.39 per ton, equivalent to .68 cents per ton per mile, Burlington's portion $1.76 per ton, equivalent to 1.19 cents per ton per mile; Laird, one hundred seventy-six miles, through rate $3.40 per ton, Moffat's portion $1.499 per ton, equivalent to .71 cents per ton per mile, Burlington's portion $1.901 per ton, equivalent to 1.80 cents per ton per mile; Sterling, one hundred twenty-three miles, through rate $2.95 per ton, Moffat's portion $1.318 per ton, equivalent to .62 cents per ton per mile, Burlington's portion $1.632 per ton, equivalent to 1.33 cents per ton per mile; Amherst, one hundred eighty-seven miles, through rate $3.50 per ton, Moffat's portion $1.362 per ton, equivalent to .64 cents per ton per mile; Burlington's portion $2.138 per ton, equivalent to 1.14 cents per ton mile; Hereford, two hundred miles, through rate $3.50 per ton, Moffat's portion $1.32 per ton, equivalent to .62 cents per ton per mile, Burlington's portion $2.18 per ton, equivalent to 1.09 cents per ton per mile. To eight of thirty-eight stations on the Union Pacific (the divisions to the remainder being on the same basis) are as follows: Sandown, four miles from Pullman station in Denver, where the Union Pacific receives the coal, through rate $2.00 per ton, Moffat's portion $1.50 per ton, equivalent to .71 cents per ton per mile; Union Pacific's portion 50 cents per ton, equivalent to 12.50 cents per ton per mile; Sable, eight miles, through rate $2.00 per ton, Moffat's portion $1.364 per ton, equivalent to .64 cents

per ton per mile, Union Pacific's portion 63.6 cents per ton, equivalent to 8 cents per ton per mile; Bennett, thirty miles, through rate $2.15, Moffat's portion $1.152 per ton, equivalent to .54 cents per ton mile, Union Pacific's portion 99.8 cents per ton, equivalent to 3.32 cents per ton per mile; Hugo, one hundred three miles, through rate $2.75 per ton, Moffat's portion $1.25 per ton, equivalent to .59 cents per ton per mile, Union Pacific's portion $1.50 per ton, equivalent to 1.46 cents per ton per mile; Kit Carson, one hundred fifty-one miles, through rate $3.15 per ton, Moffat's portion $1.26 per ton, equivalent to .59 cents per ton per mile, Union Pacific's portion $1.89 per ton, equivalent to 1.25 cents per ton per mile; Chemung, one hundred ninety miles, through rate $3.50 per ton, Moffat's portion $1.40 per ton, equivalent to .66 cents per ton per mile, Union Pacific's portion $2.10 per ton, equivalent to 1.11 cents per ton per mile; Masters, seventy-one miles, through rate $2.45 per ton, Moffat's portion $1.267 per ton, equivalent to .60 cents per ton per mile, Union Pacific portion 1.183 per ton, equivalent to 1.67 cents per ton per mile; Julesburg, one hundred ninety-five miles, through rate $3.50 per ton, Moffat's portion $1.47 per ton, equivalent to .69 cents per ton per mile, Union Pacific's portion $2.03 per ton, equivalent to 1.04 cents per ton per mile. To ten stations on the Rock Island east of Limon, the divisions are about the same as on the Union Pacific east of the same point.

In its former opinion wherein it reduced these through rates, the Commission found that the reduced rates fixed by it were just and reasonable, and would give to the carriers a sufficient return for the services performed. In commenting concerning it, they said:

"The Commission has given careful consideration to the conditions surrounding each particular line, and feel that they have been most liberal with the carriers in arriving at the various rates in this case. In no case, except in very long hauls, has the rate been reduced to less than one cent

per ton per mile, the general average being from 12 to 14 mills per ton per mile."

Yet in this case, when it came to divisions, the Moffat road is not given any such amounts as were stated in the former case that the particular lines were entitled to. For instance, to shipments on the Burlington, the Moffat is given rates of 5.9 mills to 7.1 mills per ton per mile, instead of an average of 12 to 14 mills, as the former opinion states; whereas, the Burlington divisions on this haul yield it from 1.09 cents to four cents per ton per mile, or nearly twice as much upon its longest hauls, and up to about six times as much per ton per mile upon its shortest haul, an average of about twice as much on all hauls. The same is true concerning the Union Pacific, and the Rock Island. It will thus be observed that these divisions are all out of proportion to the mileage, the amount allowed per ton per mile for such mileage, or the cost of carriage. 'Tis true, as counsel for respondents urge, the testimony shows that for a short haul on their lines the expense of carriage is greater per mile than upon a longer haul on the same line. For this reason they urge they should be allowed a greater amount per mile than the Moffat road for its longer haul. We appreciate that the Interstate Commerce Commission recognizes this fact, and makes such allowances to the extent of fixing a minimum of twenty-five per cent for the short haul. See *Hayden Brothers Coal Corporation et al. v. Denver & Salt Lake Railroad Co. et al.,* 45 I. C. C. 236, wherein at page 244, it is said:

"The result of applying the method of dividing on a mileage prorate with a minimum of 25 per cent to the short line, which is a common method of dividing rates when an originating or delivering line has a relatively short haul."

If this rule were applied here, and the cost of carriage for the shorter haul considered as a factor in fixing the divisions, which we agree should be, it must still be conceded that there are but two hauls involved which do not give respondents a division greatly in excess of twenty-five per cent., while there is no testimony which shows that

any of these hauls on their lines cost any more, or even as much, per mile, as does the longer hauls on the Moffat line. Besides, this argument does not sustain the claim that the Commission's divisions were based upon the theory of these differences in the distances of carriage, for the reason that the same discrimination is made to stations where the distance on each road is about the same. To illustrate, the distance from Utah Junction to Hereford on the Burlington is two hundred miles, the through rate is $3.50 per ton, the Moffat's portion is $1.32, or .62 cents per ton per mile, the Burlington's portion is $2.18 per ton or 1.9 cents per ton per mile, being over twice as much for practically the same distance. The remainder of the longer hauls, from fifty miles up, on the Burlington will be found upon practically the same basis. This is likewise true of the Union Pacific. Take Julesburg one hundred ninety-five miles from Denver, or Pullman station in Denver, where it receives the coal, the through rate is $3.50 per ton, the Moffat's portion is $1.47 per ton, or .69 cents per ton per mile, the Union Pacific's portion is $2.03 per ton, or 1.04 cents per ton per mile; to Chemung, a distance of one hundred ninety miles from Pullman, the through rate is $3.50 per ton, the Moffat's portion is $1.40 per ton, or .66 cents per ton per mile, while the Union Pacific's portion is $2.10 per ton, or 1.11 cents per ton per mile. In arriving at this conclusion the Commission says:

"It is a general principle that the proportion of a through rate shall be somewhat lower than the local rate; there are many reasons why this should be so, and the Commission can see no reason why that principle should not be followed in this case."

The Commission, however, did not apply this principle to the respondents' roads, but only to the petitioners'. In comparing these rates with the rates on respondents' roads from the northern coal field immediately north of Denver, the Commission says that they are not disproportionate with them. But their figures are not in harmony with these findings. They show that in making these divisions

they gave to the Union Pacific, to points on its Kansas division east of Denver, and to points on its Julesburg branch east of La Salle divisions, which average about ninety and eight-tenths per cent. and one hundred two and two-tenths per cent., respectively, of its local rate from the northern Colorado coal fields to the same points; when it only gave to the Moffat road eighty and eighty-five per cent., respectively of its local rates to Denver; that they gave to the Burlington divisions, which average one hundred twenty per cent. of its local rate from the northern coal fields to the same points, while it gave to the Moffat road on coal going to these same points, divisions which average only eighty-four per cent. of its local rate to Denver. Besides, there is no testimony which shows that these local rates on the Burlington and the Union Pacific are exceptionally low, as was shown concerning the Moffat local rate to Denver. The petitioner claims that there was no testimony offered of these local rates on the Burlington and the Union Pacific, for which reason that the Commission was without authority to consider them for comparison purposes. The petitioner also claims that had they been introduced in evidence, it could have shown that these hauls were on prairie lines, etc., and therefore not comparable to that of the Moffat road. Respondents have failed to show, and we have been unable to find, that these local rates were offered in evidence, for which reason the Commission was without authority to consider them for any purpose. *Interstate Commerce Commission v. Louisville & Nashville Railroad Co.,* 227 U. S. 88, 57 L. Ed. 431, 33 Sup. Ct. 185. We have commented upon these rates, using the figures given in the Commission's opinion, and the briefs for the purpose of showing (were they in evidence) the unequal portion of the divisions here made, when compared with the local rates of each line. The respondents recognized these vast discriminations, in so far as all facts heretofore stated are concerned. They seek to justify their right to the excessive portion on the theory, among others, of strategic position, prior service to these districts from

other fields, which, under the former higher rates gave them these same divisions, and for the further reason that since the reductions other initial carriers have agreed with them upon the old divisions.

The record discloses that for many years the respondents have been receiving coal from other roads at Denver, and delivering it to these stations from what is called the Walsenburg district, an average of one hundred ninety-five miles south of Denver; that coal from this district, under the old divisions had been supplied to these stations for many years before coal from the Moffat Oak Hill district entered the field; that in 1909 the Oak Hill district first became a factor, when the Moffat road fixed a rate to Denver of $1.60 per ton on lump coal and $1.40 per ton on slack, being the same as from the Walsenburg district; that it likewise accepted the same divisions of the through rates to points involved (except stations on the Rock Island) as were given to the initial carriers from Walsenburg. For these reasons and others, which will hereafter be considered, respondents contend that when any deduction is made in the through rate, it should follow, as a matter of course, that the divisions of the lower rate should be upon the same basis, regardless of the inequalities in the former divisions. The Commission appears to have acquiesced in this position. We cannot agree with this conclusion, and the authorities do not sustain it. The Commission held that the former through rates were unreasonable and that the reduced through rates fixed by it were reasonable. It did not change the former rates from either district into Denver, for which reason its holding must have been that they were reasonable.

In *People's Fuel & Supply Co. v. Grand Trunk Western Railway Co. et al.,* 27 I. C. C. 24, at page 28, the Interstate Commerce Commission says:

"It is not the separate factors in a through rate, but the rate or charge as a whole, to which the test of reasonableness must be applied. In examining into the reasonableness of a combination rate or charge we are not, however,

precluded from looking to the several factors thereof, in an effort to locate unreasonableness in the total charge."

This comment is applicable to the facts here. The Commission held the former through rate unreasonable, but in making this division of the new lower rates, they based it practically upon two grounds, and decline to give consideration to the other general factors in an effort to locate the unreasonableness in the former total charge, in order to place the apportionment of the new rate where it properly belongs.

In *Stacey & Sons v. Oregon Short Line Railroad Co. et al.*, 20 I. C. C. 136, in speaking on the subject here involved, the Interstate Commerce Commission, at page 139, says:

"The question of divisions of these rates is of course now left to the defendants' to agree upon. * * * A mileage prorate basis of division would divide the earnings according to the service actually performed by each carrier."

In commenting upon this language, our Commission, in its opinion said:

"We agree with the Interstate Commerce Commission in the above statement. It is, however, of no assistance to the Commission in this case."

If they considered, as they say, that it was of no assistance to them, that means that the mileage basis was not given any consideration, or considered as a factor, or as having any bearing, in the fixing of these divisions, the divisions fixed confirm this statement. This was an error of law. Such questions are always a proper element to be considered.

*Pulp & Paper Mfg. T. Assn. v. C. M. & St. P. Ry. Co. et al.*, 27 I. C. C. 82; *Hayden Bros. Coal Corporation et al., v. D. & S. L. R. Co. et al.*, 45 I. C. C., 236.

The respondents assert that because of the prior existence and divisions of the old Walsenburg rates, and their acceptance by the Moffat road, that this is conclusive evidence that those divisions were reasonable and that for this reason the divisions of the lower rates should be upon the same basis. This position was evidently accepted by

the Commission. This does not follow as a matter of course, and is in conflict with the previous ruling of the Commission that the former through rates were unreasonable. These through rates were the sum of the divisions, they being condemned by the Commission as too high, it necessarily follows that the division to at least one of the carriers was also too high. The record shows that when the old Walsenburg rates and divisions were agreed upon, we had no Commission to appeal to in such cases. It was not until June, 1906, that the Interstate Commerce Commission had power to prescribe interstate rates.

*Minnesota Rate Cases,* 230 U. S. 352, 57 L. Ed. 1511, 33 Sup. Ct. 729, 48 L. R. A. (N. S.), 1151, Ann. Cas. 1916 A 18; *I. C. C. v. C., N. O. & T. P. Ry. Co.,* 167 U. S. 479, 42 L. Ed. 243, 17 Sup. Ct. 896.

The record shows that in order to get its coal into the Denver market, the Moffat road, when cost of carriage is considered, made a very reasonable local rate for that service; that it accepted the Walsenburg divisions of the old through rates on the Burlington and the Union Pacific, because they were the best that it could get at that time, and that it was willing to participate in those divisions, even though not profitable to it; in order to develop the coal industry along its line The right to do this is recognized by the Interstate Commerce Commission.

In *Indianapolis Freight Bureau v. P. R. R. R. Co.,* 15 I. C. C. 567, at page 576, the Interstate Commerce Commission says:

"A carrier may voluntarily make, under the force of controlling competition, rates which it might not be required to make."

Our Commission has recognized this fact. In *Greeley Gas & Fuel Co. v. The Colorado & Southern Ry. Co. et al.,* 1 Colo. P. U. C., 197, it held that voluntary rates established by carriers under high competitive conditions are not a fair measure of comparison with rates between points where little or no competition exists. By analogy, this position is applicable to a division of rates; a carrier may

voluntarily agree to a division which it might not be required to accept. This principle applies to this case. It should be borne in mind that it is the Commission's rates and the division of those rates by the Commission which are involved. They are not a matter of barter and trade and the Moffat line is not at liberty to withdraw from them if they are unprofitable, and it believes them to be unjust. For these reasons, we cannot agree that because they participated in former rates, and certain divisions thereof, which gave them a greater amount for the services rendered than those under consideration, that it follows as a matter of course that a similar division upon a lower rate fixed by the Commission is just, or that for this reason it should be divided upon the same basis and the authorities do not so hold.

In *Burnham, Hanna, Munger Co. v. C., R. I. & P. Ry. Co.*, 14 I. C. C. 299, the Interstate Commerce Commission held that the through rates from eastern points to the Missouri river cities were unreasonably high; that they were so because those portions of the through rate between Mississippi river crossings, and Missouri river cities were too high; for this reason it ordered that the divisions of certain carriers upon through transportation between Mississippi river crossings and the Missouri river cities should be reduced to a scale as therein defined. This order was upheld by the Supreme Court of the United States, *I. C. C. v. C., R. I. & P. Ry. Co.*, 218 U. S. 88, 54 L. Ed. 946, 30 Sup. Ct. 651. It was again observed by the Interstate Commerce Commission with a slight change by increases to the western lines. *Warnock Company et al. v. C. & N. W. Ry. Co. et al.*, 21 I. C. C. 546. The mileage of the western lines in those cases in proportion to the whole were, prior to this reduction, less out of proportion than the mileage to the stations east of Denver in connection with the total mileage under consideration. The fact that the former divisions had been originally agreed upon and worked under for years, was not considered as a controlling factor in taking the reduction all off of the western lines. In

*State of Iowa v. St. P., M. & O. Ry. Co. et al.,* 28 I. C. C. 64, at page 73, the Interstate Commerce Commission said:

"It does not follow, however, that a carrier's separate rates applicable to through transportation are beyond control and regulation by the Commission. On the contrary, it not infrequently happens, as in this case, that the through charges for the through service are unreasonable because one of the proportionals entering into the through charges is excessive; and in such a case and upon a proper record our authority to reduce the unreasonable through charges by reducing the excessive proportional rate is beyond question. The reasonableness of the through rates is challenged, however, by some of the complainants, and that question is before us on the pleadings and on the record, and is the question that is more particularly dealt with in this report.

In support of the various contentions of the complainants a large volume of testimony was offered, together with numerous diagrams, plats, and other exhibits, financial and otherwise, by means of which the facts are graphically represented. Although the eastern defendants took no active part in the hearing, the defense by the western lines was prepared with care. All the points to which these exhibits and testimony were directed have had careful consideration, but it is not possible and would not be profitable to extend this statement of the case by a discussion of them in detail. It will suffice to say that upon the whole record we have arrived at the conclusion, and so find, that the rates on class traffic moving between interior Iowa points and the territory east of the Indiana-Illinois state line are excessive and unreasonable, and therefore unlawful. The proportional rates between the Mississippi River and the eastern territory last defined are in harmony with the general system of rates east of the river, and there is no basis of record for condemning that factor in the through charges. The through rates exacted of shippers are made excessive by reason of the demands of the carriers west of the river, and this is the factor in the through charges that

we here condemn in finding that the through charges are excessive."

In *Cedar Rapids Commercial Club v. C., R. I. & P. Ry. Co.*, 28 I. C. C. 76, the Commission had under consideration the question of rates between Chicago and interior Iowa points. It was held that the rates between such interior points and Chicago were unreasonable, and unduly discriminative in comparison with the rates of the river towns; for this reason the through rates were unreasonable, but that the reduction should be on a graded scale between the Mississippi river and those interior Iowa points.

In *Stacy & Sons v. O. S. L. R. A. Co.*, 20 I. C. C. 136, after holding that certain through rates were unreasonable, the Commission, at page 139, says:

"The question of divisions of these rates is of course now left to the defendants to agree upon. It may be that their divisions will depend somewhat upon whether the traffic is exchanged at Silver Bow or at Butte. The Oregon Short Line haul to the junction with the Northern Pacific would be the same on a shipment to Fargo as a shipment to Bismarck, while the Northern Pacific haul would be considerably greater to Fargo than to Bismarck. The Oregon Short Line haul will be somewhat longer on shipments from Hot Springs or Brigham than on shipments from Logan. An arbitrary basis of divisions would ignore these differences in the lengths of the hauls. A mileage prorate basis of divisions would divide the earnings according to the service actually performed by each carrier. If defendants are unable to agree upon the divisions of the rates herein prescribed the Commission will, upon further hearing, determine that question."

Neither can we agree that it is always customary where a through rate has been reduced, to prorate the reduction between the carriers upon the same basis as each one's reduction bore to the whole. In some cases that system has been adopted, but an investigation of them will disclose that the original apportionment was in harmony with some reasonable division in proportion to the mileage of each, and

the services rendered; while in others the rule has not been followed at all; but to the contrary they are based upon some equitable division in proportion to the mileage of each. For instance, in *Sloss-Sheffield Steel & Iron Co. et al. v. L. & N. R. R. Co. et al.*, 35 I. C. C., 461, where a reduction was made on pig-iron rates in car lots from producing points in Alabama and Tennessee to points north, including Chicago, it was held that the southern carriers should bear twenty-three cents, and the northern carriers twelve cents out of a thirty-five cent reduction from a former rate of $4.35 when reduced to $4.00. The new division gave to the southern lines operating between Birmingham and the Ohio river $2.52 and the northern lines operating between the river and Chicago, $1.48, the former division of the $4.35 rate being $2.75 to the southern line and $1.60 to the northern lines, the average distance through the gateway (the Ohio river) was three hundred sixty-six miles from Birmingham, and two hundred eighty-seven miles from Chicago.

While it may be conceded that the strategic position of a company's road may be taken into consideration in the matter of divisions, it is not by any means the sole or controlling factor. In the case last cited on this subject, the Commission, at page 463, said:

"The northern carriers take the position that no part of the reduction should be borne by them. Their contention is based chiefly on the theory that pig iron from the south displaces pig iron produced at furnaces in their own territory, and therefore does not furnish them any additional traffic over and above what they would otherwise haul. In view thereof, and of the fact of their strategic position, with respect to traffic that originates in their own territory, they claim to be possessed of equities and of trade advantages which entitle them to larger divisions than they might otherwise reasonably demand.

The contention in part implies an assumption that there is practically no demand for pig iron in the northern markets which could not be supplied from furnaces in central

freight association territory. The evidence shows, however, that for many uses, especially in the manufacture of stoves, small castings, and certain kinds of machinery, southern iron is preferred, and that there is considerable demand for it in the northern markets. It commands a ready sale as a mixture for many kinds of iron products. This is true to such an extent that some foundries are quite largely dependent upon it because of its peculiar qualities as distinguished from pig iron from the northern furnaces. It is therefore a matter of general public interest that southern iron should move freely into the northern territories."

To some extent this condition prevails here. The uncontradicted testimony discloses that the Moffat coal is harder than that in the southern fields, or even the Rock Springs Wyoming coal on the Union Pacific, or that in the Big Horn Basin on the Burlington, and, that it develops tests which disclose its superior qualities. The coal in the local fields north of Denver is not claimed to be its class; that for all of these reasons there is an increasing demand for it, and that it commands a ready sale, which is increasing in the territory in question, as well as in Nebraska, Kansas and other points. In such cases, as stated by the Interstate Commerce Commission, it is a matter of general public interest that it should move freely into the eastern territory. The Moffat road should not be discriminated against because it is on its line. The question of the market and demand for this coal was eliminated by the Commission in fixing these divisions. This was error. In *Hayden Bros. Coal Corporation et al. v. Denver & Salt Lake R. R. Co. et al.,* 45 I. C. C. 236, wherein the Commission fixed divisions on this coal to points in Kansas, Nebraska, Missouri and South Dakota, at page 237, it said:

"The delivering lines contend that consideration should be given to the fact that coal from the Oak Hills district displaces that which could be supplied by those roads from producing points on their own lines, and thus deprives them of a longer haul if the coal were to originate at the latter

points. But this last contention was also offered by these same carriers in the original case, and was there rejected as not being a sufficient reason for refusing to establish joint rates from Oak Hills to such destinations. Likewise, in the matter of divisions, such a proposition can not be controlling in the determination of the portion of the rate which should accrue to the delivering lines for the service which they perform on coal originating at the Oak Hills mines."

While it is true that in this case the Interstate Commerce Commission gave to the Moffat road a smaller amount than our Commission has awarded it for these intrastate shipments, it was upon a three-line haul, and the amount awarded to the delivering carrier is very much less than awarded here; also the divisions for these interstate shipments are somewhat equal in proportion to the mileage of each, while the divisions under consideration are all out of proportion to the mileage, the services rendered, or the cost of carriage. This condition is more clearly shown between the intrastate and interstate divisions on the Union Pacific for the same coal over the same line. To illustrate, in the case last cited, the through rate under consideration on coal from Oak Hills to points on the Chicago and Northwestern Railway Company hauled from Denver to Fremont, Nebraska, over the Union Pacific was $4.00, the Commission gave to the Union Pacific $2.13¾ per ton as its portion for hauling the coal a distance of five hundred twenty-five miles. By the division under consideration, it gets $2.03 for its haul for the same coal over the same line from Denver to Julesburg, a distance of one hundred ninety-five miles, yet its strategic position is just as favorable upon the Fremont haul as it is upon the Julesburg haul, so far as furnishing coal from mines upon its lines are concerned, both being upon its main line, where they can be readily supplied from its Wyoming fields. This case also discloses that under the divisions therein fixed, the Union Pacific gets more per ton per mile for its Oak Hills-Fremont haul than it gets for its Rock Springs-Fremont haul, a dis-

tance of seven hundred sixty-three miles, and much more than for its Evanston haul to Fremont, a distance of eight hundred seventy-eight miles, for which it voluntarily accepts a division of $3.00 per ton. Other similar illustrations could be shown which tend to disclose the vast discrimination under consideration. In commenting upon the former Walsenburg rate, our Commission, in its opinion, says:

"The joint rates on coal from the Walsenburg District to points on the lines of the defendants, have been in effect for many years, and as far as this Commission has been advised, the divisions of the same have been entirely satisfactory to all concerned.

The Commission feels that a condition which has been in effect for so many years, and which is so closely associated with the present case, should have some weight and be given careful consideration."

*In re Rates on Lumber, etc.,* 31 I. C. C. 673, is cited as authority for this conclusion, also as a precedent for making the divisions the same as they were on the old rates. An examination of this case discloses that conditions are not similar. Had the respondents parallel lines to the Moffat road from Denver into the Oak Hill district and were hauling similar coal upon their own line from this district, throughout the entire distance, and the Moffat road was asking for a larger division than formerly for its haul to Denver, the Arkansas case would be applicable so far as these phases of it are concerned, and would be entitled to be given consideration accordingly. But even then as a comparison of the divisions in that case will disclose, it would not be authority to justify the divisions under consideration, besides there are other elements which enter into this case, which are ignored by the Commission which would distinguish it from that even though the product came from different directions, for instance, it appears to be conceded that the cost of carriage per mile upon the different lines in the Arkansas case was practically the same. There is a vast difference in this respect here. It

is uncontradicted that the mountainous character of the
Moffat line is such that it greatly restricts the number of
cars that can be handled in a train; that it requires two
and sometimes three engines, over a part of the line, to
haul twenty-three cars. The cost from Walsenburg is much
less expensive. It is shown that one engine can haul over
twice as many cars from this district as can two over the
entire line of the Moffat road.

In *Coal Rates from Oak Hills, Colorado*, 35 I. C. C. 456,
the Commission, in fixing the divisions between the Moffat
and Rock Island road recognizes a distinction wherein in
concluding its findings, it is said:

"This report deals with a particular case. It refers only
to the relations between the Moffat road, and the Rock Is-
land lines on a particular commodity, and is not intended
for application to other commodities or to the relations of
the Moffat road, the Rock Island, or both, with other roads.
The divisions received by the initial lines in the Walsenburg
district, on coal delivered to the Rock Island at Pueblo,
while not as large as the constant divisions herein found
reasonable for the Moffat road in connection with the Rock
Island at Denver, yield much higher returns per ton-mile.
We have not considered them sufficiently high to measure
the divisions which the Moffat road should receive for its
haul from Oak Hills to Denver. The divisions and revenues
herein found reasonable for the Moffat road's services in
connection with the Rock Island should not be used to
measure the divisions of the carriers serving the mines at
Walsenburg on coal delivered to other carriers at Pueblo or
at Denver, or its own in connection with other carriers."

A comparison will disclose that the rates under consid-
eration are all out of proportion to those fixed in the Rock
Island case, when considered from a mileage basis.

There are other reasons which enter into the consid-
eration of divisions from Walsenburg that do not apply to
the Oak Hills district, which tend to show that initial car-
riers from Walsenburg might be willing to accept the old
basis of divisions, when it would not be just to the Moffat

line. For instance, the testimony discloses that the Colorado & Southern with a line from the Walsenburg district to Denver is controlled by the Burlington, that between them it makes no difference what the divisions are, but if the Colorado & Southern joined in a request for more equal divisions, and it was granted, the Burlington would get less for its haul when the coal was received at Denver from the Denver and Rio Grande Railroad Company. There is no testimony which discloses that the Denver & Rio Grande Railroad Company is not satisfied with these divisions, but the cost of their haul from Walsenburg to Denver is materially less than that of the Moffat road from Oak Hills. The Denver & Rio Grande serves a large territory out of Denver. It takes both passengers and freight from the Burlington and Union Pacific to the south and west. To many stations on its line for shipments coming from the east on the Burlington and Union Pacific, it is in the same favorable position for exacting unequal divisions upon such shipments as the respondents are with it to stations on their lines east of Denver. The Moffat road is not thus favorably situated. So far as business from the east is concerned, it might be said that it ends nowhere and has nothing to offer, like the Denver & Rio Grande and the Colorado & Southern, when it comes to a question of barter and trade concerning divisions. For this additional reason, this discrimination against the Moffat road reached in part by a comparison of what has been agreed to between the other roads is erroneous.

The former division sheets were not submitted to the commission before the hearing, but after the arguments the commission issued an order requiring all parties to furnish them, which was done. The petitioner claims that it was relying upon the commission to decide these cases upon the record made; that it refrained from introducing its former division sheets, for the reason that it considered them incompetent and immaterial, it being admitted that the new rates were constructed on a different basis from the former ones, to-wit, for each station instead of group-

ing them. It further suggests that the previous divisions from the Walsenburg lines bear on their face evidence of bargaining between the carriers, and cite the testimony of Mr. Spens, a witness for the Burlington, in corroboration of this claim, wherein he states that they tried to get all they could. They further cite a portion of the commission's opinion, wherein it is said: "As far as this commission has been advised, the divisions of the same have been entirely satisfactory to all concerned." Counsel urge there is no evidence to that effect; that had these division sheets been in the record when the testimony was taken, so it would then have been advised that the commission would consider them, that it could and would have introduced testimony to establish that such divisions were not satisfactory to all concerned; that their lack of opportunity to produce evidence showing this and other facts concerning the original divisions was prejudicial error. *I. C. C. v. L. & N. R. R. Co.*, 227 U. S. 88, 57 L. Ed. 431, 33 Sup. Ct. 185, is cited as sustaining this position. The question involved was the legal sufficiency of the evidence to sustain the commission's order. The commission contended that the law imposed upon it the duty of keeping itself informed upon the condition of railroads; that for this reason it could consider the information so obtained in deciding questions involved in hearings. In answer to this, the court, at page 93, says:

"The commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. *Int. Com. Comm. v. Baird*, 194 U. S. 25, 48 L. Ed. 860, 24 Sup. Ct. 563. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the commissioners can not act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered, and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evi-

dence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense."

Counsel for respondents concede that this declaration would be applicable, had the petitioner, after notice of this order and the furnishing of those sheets, requested permission to offer further testimony and argument, and suggests that upon request the commission would undoubtedly have granted it. As counsel agree upon the rights of each to offer further testimony after the receipt of division or rate sheets, and as the case must be reversed for other reasons, it is unnecessary to pass upon the respective contentions concerning this assignment.

Respondents urge that if these divisions are fixed in amounts different than those from Walsenburg, it will require them to haul coal from Denver to the same stations east at different amounts for the same haul, depending upon which of these fields it comes from. This, they say, would present an unlawful discrimination against them. In presenting this argument, they overlook the converse of it, adopted by the commission, against the Moffat road, in their favor, and which they seek to justify, that is that in fixing the divisions for the Moffat road on coal from the Oak Hills district, the commission has fixed its division in something over fifty different amounts for the same haul, depending upon the destination of the coal. To illustrate, on the Burlington, if consigned to Derby, ten miles from Utah Junction, the Moffat road gets $1.50 per ton, but if consigned to Barr, twenty-two miles from Utah Junction, it gets but $1.303 per ton, while if consigned to Fort Morgan, a distance of eighty-two miles from Utah Junction, it gets $1.25 per ton; while if to Laird, a distance of one hundred seventy-six miles from Utah Junction, it gets $1.499 per ton, and so on. The same method is applied to the Union Pacific and Rock Island, the Moffat road being allowed, as its division, a different amount for nearly every station, though its haul is the same for each. Respondents not only make no complaint concerning this, but seek to justify it. In such case they ought not to complain when

. the same results follow against them because they have different divisions with other roads fixed by agreement.

The respondents were allowed to show the proportion of cars for Moffat coal loading furnished by their respective roads for about three years prior to this hearing, it being in their favor, although gradually decreasing. They urge this as one of the reasons for the unequal division in proportion to the mileage basis. The commission accepted this as an item to be considered in deciding the question. We can not agree with this conclusion. In *Huerfano Coal Co. v. Colorado & Southeastern R. Co. et al.*, 28 I. C. C. 502, the Interstate Commerce Commission held that each carrier on a through route owes a duty to the public to furnish its proportion of cars for the traffic over the through route; that the proportion of each should be the proportion it would have to furnish if a car for car interchange was actually made at the junction points. The record shows that a large number of cars furnished by respondents were for shipments of coal to points on their lines beyond Colorado. No testimony was offered as to the number for intrastate shipments alone. For this reason, it is impossible to tell whether, even in the past, respondents have furnished more than their share for the stations under consideration. The record shows that the portion furnished by the Moffat road is increasing, but unless provided by agreement, this matter should not have any bearing on a division to be fixed by the commission for the future. The petitioner contends that this should not have been considered for the reason, among others, that the use of foreign equipment is compensated for by a *per diem* charge on each car between the roads, therefore it would be unjust to penalize, by low divisions, a road which uses a large proportion of foreign equipment when the road pays a *per diem* rental for that equipment. They cite no testimony showing such a custom, for which reason we will not consider it, but without it are of opinion that it ought not to be taken into consideration in fixing these divisions. There is no showing or promise as to what any road will do in the future in this respect.

The commission made no order concerning it. If either fails to do its share, the rule for which has been laid down by the Interstate Commerce Commission, we take it that upon complaint our commission would have jurisdiction and certainly would not require the respondents to do more than their share.

In *Wichita Board of Trade v. A., T. & S. F. Ry. Co. et al.,* 25 I. C. C. 825, in commenting upon this question, at page 631, the Interstate Commerce Commission says:

"We are not impressed by the contention of the Union Pacific that the present adjustment is necessary in order that it may retain possession of its equipment. As we have announced in previous cases, it is proper that the carriers, as between themselves, should adopt reasonable regulations calculated to induce the prompt return of cars by foreign lines, but a carrier has no right to establish regulations or fix rates with a view to controlling the direction in which its equipment shall be employed by the shipping public. *Missouri & Illinois Coal Co. v. I. C. R. R.,* 22 I. C. C. 39."

By analogy, this declaration is applicable here. In *Louisiana & P. Ry. Co. v. United States,* 209 Fed. 244, the court held that a reasonable division out of joint rates could not be denied a common carrier for transportation services by the Interstate Commerce Commission, because of any past or present derelictions, or even the fear of further violations of law.

Counsel for respondents suggest that in July, 1916, the Moffat road filed with the Public Utilities Commission a freight tariff naming its proportional rate on coal from Oak Hills district to Littleton and Englewood, viz, the Santa Fe, they say that while the tariff is not a part of the record, yet it has been filed, and that this court in reviewing the decisions of the commission should take notice of the public records of that office. In just what manner this is to be done, they do not say. Assuming that we will take judicial notice of the commission's opinions, which are furnished in pamphlet and bound volume, we can not agree that we should take notice of the records in that office. Had

counsel desired this court or the commission to consider that rate sheet, they should have offered it as evidence.

The petitioner is without terminal facilities in Denver, for which reason the commission held that out of its divisions incident to delivery to the Union Pacific and Rock Island, it must pay the twenty cents per ton charged for the switching which is performed by another company. Error is assigned to this ruling. *People's Fuel & Supply Company v. Grand Trunk Western Ry. Co. et al.,* 27 I. C. C. 24; same title, 30 I. C. C. 657, and *Waverly Oil Works Co. v. Pennsylvania R. Co. et al.,* 28 I. C. C. 621, are cited as sustaining it; while *Sloss-Sheffield Steel & Iron Co. v. L. & N. R. R. Co.,* 35 I. C. C. 460, is relied upon as holding to the contrary. The rule announced in the cases first cited appears to be the general one (of course with exceptions) followed by the Interstate Commerce Commission. We can not agree that the testimony was insufficient to justify its adoption here. We do not concur, however, when applied to this case, in the quotation cited from the first of these cases, which reads:

"If it can not afford to pay for the terminal services which other * * * carriers provide, it will doubtless have to retire from competitive traffic."

The day when this quotation was applicable in a case of this kind has gone by. Since rate-making power, as well as fixing the divisions, has been lodged in commissions both state and federal, the carriers are not at liberty to retire from a rate or division fixed by the commission so that shippers on their lines will have no opportunity to compete with those on others. The carrier's remedy, as adopted here, is by an appeal to the commission and then to the courts.

In harmony with the rule followed in *Interstate Commerce Commission v. Union Pacific Railroad Company et al.,* 222 U. S. 541, 56 L. Ed. 308, 32 Sup. Ct. 108, we have given all the testimony, including the comparison of these divisions with divisions upon other roads and on these in interstate shipments, as well as the deductions sought to

be drawn therefrom, together with all other competent testimony, careful consideration. To summarize, our conclusions are that for the reasons and in the particulars above stated, the commission erred, as a matter of law, in considering and giving effect to facts which should have no bearing upon the question, and in failing to consider and give effect to other facts which were entitled to consideration; that their order is not supported by any substantial testimony; that it is not in accordance with the evidence, and that when tested by the uncontradicted testimony, it is unjust and unreasonable. Their conclusions in these respects involve errors of law. *Louisville & N. R. Co. v. United States,* 227 Fed. 258; *Louisville & N. R. Co. v. United States,* 216 Fed. 672.

The petitioner calls our attention to that portion of section 52 of our Utilities Act which says:

"Upon hearing, the Supreme Court shall enter judgment either affirming, setting aside, or modifying the order or decision of the commission."

It contends the testimony discloses that the divisions should be in certain amounts, stating them, and that the above language is authority for us to, and that we should, modify the order of the commission by fixing the divisions in these amounts. We can not agree with this position. This court is not a rate-making tribunal and the language quoted was not intended to make it such. The authority to do this is vested in the commission, with the right to a review by this court. We are not only not authorized to fix a division, but feel it our duty, and have attempted to discuss the points under consideration in a manner that will not disclose our personal views upon the weight to be given any competent testimony, or the result that should follow, and thereby embarrass the commission in its determination of these questions, when considered under correct principles of law.

For the reasons stated, the decision and order of the commission will be reversed and set aside and the cause

remanded for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.

Decision *en banc.*

Mr. Justice White and Mr. Justice Bailey not participating.