The Mountain States Telephone and Telegraph Company, a Colorado corporation v. The Public Utilities Commission of the State of Colorado, and Henry E. Zarlengo, Howard S. Bjelland and Edwin R. Lundborg, Commissioners

## No. 25975

The Colorado Municipal League, a Colorado corporation v. The Public Utilities Commission of the State of Colorado, and Henry E. Zarlengo, Howard S. Bjelland and Edwin R. Lundborg, Commissioners

## No. 25984

Secretary of Defense on behalf of the Department of Defense and all other Executive Agencies of the United States v. The Public Utilities Commission of the State of Colorado, and Henry E. Zarlengo, Howard S. Bjelland and Edwin R. Lundborg, Commissioners

(527 P.2d 524)

Decided September 30, 1974. No. 25965 rehearing denied November 4, 1974. No. 25975 opinion modified and as modified rehearing denied November 4, 1974.

Akolt, Dick, Rovira, DeMuth & Eiberger, Stuart S. Gunckel, for plaintiff-appellant Mountain Bell.

John P. Moore, Attorney General, John E. Bush, Deputy, Eugene C. Cavaliere, Assistant, James K. Tarpey, Assistant, for defendants-appellees Public Utilities Commission of the State of Colorado and the members thereof.

Gorsuch, Kirgis, Campbell, Walker and Grover, Leonard M. Campbell, Howard J. Beck, Kenneth G. Bueche, for plaintiff-appellant Colorado Municipal League.

James L. Treece, United States Attorney, Irving Jaffe, Acting Assistant Attorney General, Donald Etra, Attorney, Department of Justice, Robert E. Kopp, Attorney, Department of Justice, John W. Madden, III, Assistant United States Attorney, for plaintiffs-appellants Secretary of Defense.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This appeal involves objections to telephone rates set by the Public Utilities Commission. The district court affirmed, as do we.

The Mountain States Telephone and Telegraph Company, here called Mountain Bell, on January 27, 1972, filed an advice letter with the Commission, containing tariff revisions. C.R.S. 1963, 115-3-4. The proposed revisions provided for an across-the-board increase of approximately 18-1/2% of all basic rates and for additional increases on certain particular services. This would yield additional gross revenue of $39,630,939 based on the year 1971, the test year. Acting under 1969 Perm. Supp., C.R.S. 1963, 115-6-11, the Com-

mission upon its own motion suspended the effective date of the tariff revision and set the matter for hearings which were conducted in Denver, Grand Junction, Colorado Springs, Lamar, Greeley, Alamosa and Durango. The transcript of these hearings consists of 43 volumes, exclusive of a few thousand pages of other record.

The hearings took place in March, April, May and June 1972 and the Commission entered its order on September 19, 1972. Earlier, on March 25, 1971, the Commission authorized a rate increase to Mountain Bell designed to give it an 11.4% return on common equity. This was affirmed by us in *Mountain States T. & T. Co. v. Public Utilities Commission,* 182 Colo. 269, 513 P.2d 721 (1973). In its decision of September 19, 1972, the rate increases allowed again were designed to produce the 11.4% return on common equity. The Commission found that the new rates would return for the test year 8-5/8% of the value of Mountain Bell's property devoted to intrastate telephone service (rate base), or $41,764,000 net operating earnings.

The Commission found that applying existing rates, in effect prior to the increase, to the test year there would be a return of 7.36% on the rate base, or $35,630,000. It further found that while such a return would not be confiscatory, it would be below a fair and reasonable return.

The 1971 order was predicated upon a test year of a 12-month period ending on October 31, 1970. The rates then ordered would produce a return of 8.9% on the rate base and, as mentioned, a return on common equity of 11.4%.

While in the district court the Colorado Municipal League asked that the Commission be reversed in certain respects and, while it appealed to this court, in its brief here it urges only affirmance of the Commission and the trial court.

I.

Mountain Bell argues that, in reducing the rate of return from 8.9% to 8-5/8%, the Commission acted arbitrarily.

Mountain Bell's witnesses on rate of return were its vice-president, Mr. James Heckman, Dr. J. Rhoads Foster, a

consulting economist, and Mr. B. A. Parkhurst of New York City, president of Parkhurst Computer Research, Inc. Mr. Heckman expressed the opinion that the return on the rate base should be 10.7% and on the common equity should be between 12% and 15.8%. Dr. Foster expressed the opinion that the return on the common equity should be between 12.5% and 13%. Mr. Parkhurst testified — and had an exhibit — concerning rates of return of various industrial groups. He stated in effect that, in order for Mountain Bell to sell large quantities of stock without dilution, the return on equity should be 13.6%. In some contrast, he testified that the average rate of return in the communications industry was about 9.03% on common equity. His exhibit and his testimony disclosed that industries in the upper half of all industries, so far as rate of return on common equity is concerned, had an average of 14.01% return, and that the lower half, in which the communications industry is located, had an average return on equity of 9.77%.

We find some merit in the following statements contained in the brief of the Colorado Municipal League:

"Mountain Bell founded its rate of return case in these proceedings on the same erroneous assumption that it had in previous cases, that is trying to persuade the Commission to be impressed by the comparable industrial earnings approach. The Company presented its vice president, Mr. James Heckman, who neither presented novel theories nor additional financial information to the Commission. To seek a national expert, the Company resorted to J. Rhoads Foster, whose testimony regarding 13 food processors . . . was found to be at odds with the evaluation by the Company's other witnesses. The Company also presented Mr. B. A. Parkhurst whose testimony was as sophisticated as a modern computer could make it, but his integrity compelled him to admit that his research services and data were never used for regulatory purposes, were not prepared to determine comparable risks and earnings, but only to enable sophisticated investors to maximize their earnings by appreciation as well as income."

Four other witnesses testified as to rate of return on the rate base which Mountain Bell should have, and three of these expressed opinions as to equity return, as follows:

| Return on Rate Base | Equity Return |
|---|---|
| 1. 7.75% — 8.35% | 9.25% — 10.25% |
| 2. 8.48% | |
| 3. 8.4% — 8.7% | 11.00% — 11.5% |
| 4. 8.48% — 8.5% | minimum of 10.1% |

We quote with approval from the findings and conclusions of the trial court:

"Notwithstanding all that has been said with respect to the statutory barriers to the complaints of The Secretary of Defense and Mountain Bell, the Court has made an independent review of the law and facts, as those terms have been defined by the Colorado Supreme Court in *Public Utilities Commission v. Northwest Water Corporation,* 168 Colo. 154, 162-172, 451 P.2d 266, 272-275 (1969), and find that there is substantial evidence in the record to support the findings of fact made by the Commission in Decision No. 81320. I further find that the Commission properly applied the concept of the past test year in determining the operating expenses, depreciation expenses, taxes and rate base in determining the revenue requirements for Mountain Bell. I further find that the 8-5/8% rate of return on rate base allowed by the Commission was within the zone of reasonableness and did not result in either an unconstitutional confiscation of the property of Mountain Bell or in an unjust exploitation of customers of said company. There is a zone of reasonableness within which the rate of return may properly fall. It is bounded at one end by investor interests against confiscation and at the other by the consumer interests against exorbitant rates. *Washington Gas Light Co. v. Baker,* 188 F.2d 11 (D.C. Cir. 1950) . . . . As was stated in the *Northwest Water* case, supra, at 181:

" 'The determination of the *rate of return,* like the fixing of rates, involves many questions of discretion and judgment, which, as we pointed out above, is the task of the

Commission and not the courts. So, if the findings of fact on which the rate of return is founded have a legally adequate basis in the evidence and pass the constitutional tests heretofore outlined, the courts cannot disturb the Commission's determination.'

Accord: *Colorado Municipal League v. Public Utilities Commission*, 172 Colo. 188, 206-211, 473 P.2d 960, 969-971 (1970)."

▪ The extent to which there can be judicial review of the Commission's decisions is set forth in 1969 Perm. Supp., C.R.S. 1963, 115-6-15(3):

"The review shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence."

▪ The rates of return specified by the Commission are supported by competent evidence. We can find no violation of constitutional rights. We regard the decision as just and reasonable.

### II.

▪ Mountain Bell has presented three additional arguments for the proposition that the 11.4% return on equity is unreasonable and arbitrary.

### A.

About 86% of the capital stock of Mountain Bell was held by American Telephone and Telegraph Company. The remaining 14% was owned by 27,210 minority stockholders. In 1972 when the market price of Mountain Bell's stock was 21-1/8, it offered 9,868,554 new shares to its stockholders at 19-5/8. American Telephone and Telegraph Company subscribed fully to the new offering. 52% of the 682,462 shares offered to the minority stockholders was not purchased.

Mountain Bell quotes the Commission in its 1971 decision as follows:

" 'Any substantial impairment of the Company's capability to attract new capital to fulfill its service obligations is certainly detrimental to the public's interest.' "
According to Mountain Bell, the subscription failure proves that the 11.4% return authorized in the 1971 decision was causing it to suffer an impairment of its financial integrity and of its capability to attract new capital.

Mr. Heckman testified that, in order to be able to sell a new issue, the price should be 15% to 20% under the market in order to compensate for market pressure. Here the discount was only about 7%. Therefore, considering the testimony of Mountain Bell's vice-president, we approve the conclusion of the trial court that the reason for the lack of sale of all of the stock was the failure by Mountain Bell to allow a sufficient differential for market pressure.

### B.

Mountain Bell points out that in the 1971 decision the Commission recognized that the rate of return must be sufficiently high to permit the utility's stock to be valued on the market above its book value in order to avoid impairing the company's future financing. It then shows that prior to the 1971 decision the book value of the stock was $21.39 per share and the average market price per share was $22.89; and that after the 1971 decision the book value was $21.89 and the market fell to about $20 per share.

Mountain Bell has failed to demonstrate that the drop in the market price of the stock was the result of the 11.4% rate of return authorized by the Commission. It must be born in mind that, with respect to its intrastate business, Mountain Bell is subject to regulation in six other states; Arizona, Idaho, Montana, New Mexico, Utah and Wyoming; and that its interstate operation is regulated by the Federal Communications Commission. Further, the record shows that the Phase I and Phase II of the Economic Stabilization Program influenced the market price of the stock during 1971 and 1972. Additionally, reduction of Mountain Bell's debt by the stock issue above mentioned, sold at less than book value, would dilute the capital account.

Mountain Bell quotes from the Commission's 1971 decision, "any material change in the debt ratio will effect a change in the financial risk assumed by the equity owner and the fair return on equity which is, after all, directly related to the risk involved." Mountain Bell asserts that in the test year its debt ratio was higher than during the test year involved in the 1971 decision. This argument might influence us if we were the Public Utilities Commission of Colorado. In our reviewing position, we must say that it has not been demonstrated that the Commission by its action has departed from the zone of reasonableness.

"Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base." Mr. Justice Douglas in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1943).

### III.

Mountain Bell contends that the Commission acted arbitrarily and capriciously in using the calendar year 1971 as the test year and in rejecting and accepting certain out-of-period adjustments under Rule 31 of the Commission's Rules of Practice and Procedure. We have been favorably impressed with the trial judge's findings, conclusions and judgment in this matter. It is apparent that he spent long and arduous hours in the study of this case and his findings and conclusions have been a real help to us. We again quote him: "The complaint of Mountain Bell in this case is a continuation of the basic disagreement between Mountain Bell and the Commission concerning the use of the concept of the past test year for the purposes of rate making. Mountain Bell in this case has espoused a concept of a future budgeted year as the proper test year for fixing rates, whereas the Commission has steadfastly adhered to the concept of the past test year for fixing of rates. As counsel indicated during oral argument before this Court, the propriety of the use of

the concept of the past test year is presently pending before the Colorado Supreme Court. Even though the Supreme Court should decide the issue prior to the entry of this opinion, the issue would not be foreclosed with respect to this case. This because the concept of the past test year is incorporated in Rule 31 D (1) which was in effect during the hearing before the Commission in this matter. In its complaint to this Court and in its brief and oral argument before the Court, Mountain Bell does not directly attack the legality of Rule 31. However, the Commission was required to follow Rule 31 and in following Rule 31 it was required to use the concept of the past test year. Thus, the attack by Mountain Bell upon the use of the concept of the past test year is necessarily an attack upon Rule 31. I find from official documents submitted to this Court by the Commission, of which the Court takes judicial notice as official records of the State of Colorado, Mountain Bell actively participated in the rule-making proceedings which led to Decision No. 80278 in Case No. 5409 promulgating Rule 31, but did not file any application for reconsideration, reargument or rehearing before the Commission challenging the incorporation of the concept of the past test year within Rule 31. Furthermore, the Court takes judicial notice of the records of this Court and notes that Mountain Bell did not file a petition for review directly attacking the legality of Rule 31, even assuming that such a petition could have been sustained in the absence of an application to the Commission for reconsideration, reargument or rehearing. The Commission's Decision No. 80278 promulgating Rule 31 having become final for failure of direct attack by Mountain Bell, Rule 31's requirement of the use of the past test year is conclusive in this collateral action. Section 115-6-12(2). Thus, since Rule 31 was in effect during the hearings before the Commission, the Commission was obligated to follow the provisions of Rule 31, one of which was the use of the concept of the past test year. In this regard, the complaint of Mountain Bell must fail."

This order was entered on March 26, 1973. The case then

pending before us, mentioned by the trial court, was *Mountain States T & T Company v. Public Utilities Commission,* 182 Colo. 269, 513 P.2d 721, announced on July 30, 1973. In it, the use of a past test year was approved.

Rule 31 was adopted by the Commission in order to avoid review by the Price Commission under the Economic Stabilization Program.

We deem it unnecessary to detail each of the out-of-period adjustments which the Commission accepted in part and rejected in part. Again, perhaps if we were the Commission we might have acted differently in a few respects, but substantially we agree with the trial court and are convinced the Commission reached a good result. We regard this as not reversible.

IV.

The appeal by the Secretary of Defense presents two questions: (1) Whether the rates fixed for Centrex CO are unreasonable and invalid; (2) whether the return on the rate base of 8-5/8% was invalid as in violation of Rule 31 of the Commission's Rules of Practice and Procedure.

The following description of Centrex telephone service is taken in large part from the brief of the Secretary of Defense. Traditionally, businesses and other organizations have employed Private Business Exchange (PBX) telephone systems. A caller to a business using PBX calls into a central switchboard at the business' office and is connected by the business' own operator to the extension desired. Employees of a business using PBX can telephone to outside parties without going through the business' switchboard, but there is no provision for billing individual extension phones to pinpoint the locations from which long distance calls are made. A Centrex system is a PBX system that offers two additional features: direct inward dialing to each extension, and station identification on outward toll calls.

There are two main types of Centrex systems: Centrex CO and Centrex CU. These systems provide the same services. There are, however, two structural differences between them. In the CO system, the switching equipment is located at the

telephone company's Central Office and in a CU system, the switching equipment is located at the CUstomer's place of business. The second difference is that a Centrex CU system utilizes trunks, or access lines, that are specifically attributable to a particular customer, while a CO system does not use specifically identifiable trunks. In addition to Centrex CO and Centrex CU systems, it is possible to. have a Centrex system which is a kind of hybrid, combining features of both CO and CU systems.

The Commission raised the rates as to Centrex CO and made them the same as those applicable to one-party flat business service.

■ The Secretary of Defense complains that (1) the rate increase was not supported by any evidence and therefore violated both the mandate of C.R.S. 1963, 115-3-1 and the Commission's own Rule 31; (2) Centrex CO customers have apparently already been paying more than their share; and (3) to equate Centrex CO charges with one-party flat business service ignores the lower cost of providing Centrex CO service. While there appears to be no evidence on the subject, the Secretary of Defense states in his brief that at Denver Federal Center, which has Centrex CO service, there are 2200 main stations, and the new rates caused an increase of monthly charges from $14,702.50 to $46,520, or an increase of 258%.

Instead of supporting the position of the Secretary of Defense, the record demonstrates to us how unfair to other telephone users was the comparatively small amount of charges to Denver Federal Center. The evidence was that, so far as is here involved, there is no material difference in costs of installation and other costs between Centrex CO and an individual business line. The record simply does not support the contention of the Secretary of Defense, whereas it does support the Commission's finding that, "Essentially, the service provided is that of an individual business line and the same rate should apply."

## V.

■ The Secretary of Defense argued that the fixing of an 8-5/8% return was in violation of Rule 31 of the Commis-

sion's Rules of Practice and Procedure, because that rule provides in effect that rate increases must be cost justified and that the overall rate of return allowed must be no greater than the rate of return needed to attract capital at a reasonable cost. The trial court found as follows:

"I have examined the Petition for Reconsideration, Reargument and Rehearing filed by The Secretary of Defense during the hearing before the Commission. I find from this examination that The Secretary of Defense did not specify Rule 31 in his petition as a ground for rehearing before the Commission. Not having specified Rule 31 as a ground for rehearing before the Commission, The Secretary of Defense may not in this Court urge or rely upon said ground for reversal or modification. Section 115-6-14(5)."

The Secretary of Defense quotes from his petition for reconsideration before the Commission as follows:

"1. The Commission erred in approving a disparate rate increase in Centrex rates without any cogent evidence in the record on the cost of Centrex service.

\* \* \* \*

"8. The Commission erred in not finding that the overall rate of return for Mountain Bell must be set at 8.48 percent."

The argument is that the substance of Rule 31 was set forth in those two paragraphs and therefore he can argue that, under Rule 31, all cost increases must be specifically and quantitatively provable and known.

We have already disposed of the arguments contained in paragraphs 1 and 8 of the petition for reconsideration. The Secretary of Defense would have us go further with respect to additional requirements under Rule 31. We agree with the trial court that those additional requirements were not presented in the petition for reconsideration. The trial court was correct in not considering them for that reason.

### VI.

In the Commission's order it found that the net effect of all the rate changes it approved would give Mountain Bell anually $2,261,000 in excess of its revenue requirements. It ordered that this excess be used to improve rural service.

In oral argument our attention was directed to the fact .

that there is pending in the district court an action brought by the Commission against Mountain Bell to require it to comply with this order. On oral argument counsel for the League urged that we should hold that the excess should be refunded to subscribers, and thereby make the district court action moot.

■ As this matter was first presented on oral argument and was not argued in the briefs, we do not pass upon the Commission's findings and order with respect to the excess, nor upon the issues in the case now pending in the district court.

Judgment affirmed.