COLORADO MUNICIPAL LEAGUE,
Plaintiff-Appellant,

v.

PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO; Commissioners Edythe S. Miller, Daniel E. Muse and L. Duane Woodard; and Mountain States Telephone and Telegraph Company, Defendants-Appellees.

No. 81SA551.

Supreme Court of Colorado.

Aug. 20, 1984.

Rehearing Denied Sept. 24, 1984.

Gorsuch, Kirgis, Campbell, Walker & Grover, Leonard M. Campbell, Simon J. Freedman, Denver, for plaintiff-appellant.

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Eugene C. Cavaliere, Asst. Atty. Gen., Denver, for defendants-appellees Public Utilities Commission of the State of Colorado, Edythe S. Miller, Daniel E. Muse and L. Duane Woodard.

Coleman M. Connolly, Denver, for defendant-appellee The Mountain States Telephone and Telegraph Company.

LOHR, Justice.

On January 21, 1980, Mountain States Telephone and Telegraph Company (Mountain Bell) filed an advice letter and tariff revisions with the Colorado Public Utilities Commission (PUC) seeking to implement a $78,628,044 revenue increase for its Colorado intrastate operations. The PUC suspended the effective date of the tariffs for 210 days, and scheduled hearings on Mountain Bell's revenue requirements. The hearing record comprises over 3000 pages of written submissions, and almost 3000 pages of transcripts spanning twelve days of testimony. On September 16, 1980, the PUC issued a 53-page order denying the requested rate increase in its entirety. *Re Mountain States Tel. & Tel. Co.,* 39 Pub. Util.Rep. 4th (PUR) [hereinafter cited as PUR] 222 (Colo. PUC 1980).

The Colorado Municipal League (League), which had intervened in the proceedings before the PUC, petitioned in Denver District Court for judicial review of the PUC's order. The League contended that the PUC should have entered an order reducing Mountain Bell's revenues. On November 12, 1981, the district court summar-

ily affirmed the PUC's order. The League then appealed, asserting that the PUC had erred on three issues: (1) The PUC allegedly found that Mountain Bell had $9,159,000 in negative working capital, but did not subtract this from the rate base; (2) the PUC allowed a $5,703,000 adjustment to expenses, representing annualization of wage increases going into effect during the test period, without making an offsetting adjustment for annualization of productivity increases; and (3) the PUC found that Mountain Bell's test period earnings exceeded its revenue requirements by $506,-000, but failed to order a rate reduction. The numerous other elements of the PUC's decision are no longer in dispute.

The PUC selected the twelve-month period ending on October 31, 1979, as the test period for the purpose of determining Mountain Bell's revenue requirement. It valued the rate base, the property dedicated to providing service to the utility's customers, at $946,269,000. It determined that a fair rate of return on Mountain Bell's common equity was 13.3%. In combination with the fixed return to the preferred stock and debt, this yielded an overall rate of return of 10.07%. Applying this rate of return to the rate base produced a revenue requirement of $95,289,000. The PUC found that Mountain Bell's net operating earnings for the test year were $95,-795,000, exceeding Mountain Bell's revenue requirement. It concluded that Mountain Bell was not entitled to any revenue increase, and permanently suspended the proposed new tariffs.

■ Statutory authority for appellate review of the PUC's order is found in section 40–6–115(5), 17 C.R.S. (1973). The purposes of judicial review are to determine whether the PUC has regularly pursued its authority, whether it has adhered to the federal and state constitutions, whether its decision is just and reasonable, and whether its conclusions are in accordance with the evidence. § 40–6–115(3), 17 C.R.S. (1973). In determining whether the PUC has regularly pursued its authority, we must consider whether its order is based

upon evidence introduced before it, whether the order is supported by findings of fact, whether the PUC applied the relevant legislative standards, and whether it acted within the authority conferred upon it by law. *PUC v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266 (1969). Orders that are arbitrary and capricious or a clear abuse of discretion must be set aside. *Colo. Mun. League v. PUC*, 198 Colo. 217, 597 P.2d 586 (1979); *City of Montrose v. PUC*, 197 Colo. 119, 590 P.2d 502 (1979).

 The fundamental legislative standard in ratemaking cases is that all public utility charges must be just and reasonable. § 40–3–101(1), 17 C.R.S. (1973). This requires balancing the investor's interest in avoiding confiscation and the consumer's interest in prevention of exorbitant rates. *Pub. Serv. Co. of Colo. v. PUC*, 644 P.2d 933 (Colo.1982); *Mountain States Tel. & Tel. Co. v. PUC*, 186 Colo. 260, 527 P.2d 524 (1974). The PUC has the primary responsibility for doing this. *PUC v. Northwest Water Corp.*, 168 Colo. 154, 451 P.2d 266 (1969).

 The findings of the PUC concerning disputed questions of fact are generally not subject to judicial review. § 40–6–115(2), 17 C.R.S. (1973). Findings will not be set aside because the evidence is conflicting, or because conflicting inferences can be drawn from the evidence, but only if the record lacks competent evidence to support them. *Morey v. PUC*, 629 P.2d 1061 (Colo. 1981); *Ephraim Freightways, Inc. v. PUC*, 151 Colo. 596, 380 P.2d 228 (1963). Nor will this court interfere with the PUC's exercise of its discretion. *Atchison, T. & S. F. Ry. Co. v. PUC*, 194 Colo. 263, 572 P.2d 138 (1977).

With these principles in mind, we affirm on the negative working capital issue. We reverse on the annualization issue, because the PUC has abused its discretion and failed to pursue its authority regularly, in that it has selectively annualized in-period wage increases, failed to make adequate explanatory findings of fact, and as a result failed to establish a basis upon which it can be determined whether the rates are just and reasonable. We affirm on the *de minimus* issue, subject to modification on remand.

## I.

 The League claims that the PUC should have subtracted $9,159,000, the amount attributable to negative working capital, from Mountain Bell's rate base, on which Mountain Bell was allowed a 10.07% rate of return. *Positive* working capital

> consists of the additional funds, provided by the investors, which may be required by the utility to meet its day-to-day operating expenses, such as maintaining an inventory of materials and supplies, meeting certain operating expenses which must be paid before the revenues associated with those expenses are received, and keeping a certain amount of cash on hand for daily operations.

*New England Tel. & Tel. Co. v. PUC*, 390 A.2d 8, 51 (Me.1978). Positive working capital is investor-supplied. In contrast, *negative* working capital reduces the need for investor-supplied capital. It arises when the utility receives customer payments before service is rendered, or when it receives other funds before it must satisfy a corresponding liability. *See Valley Gas Co. v. Burke*, 122 R.I. 374, 406 A.2d 366 (1979).

Mountain Bell bills most local service in advance, although it does not necessarily collect on all those bills before the corresponding service is rendered. It collects funds each month which are later used for payment of property taxes and federal income taxes. It remits property taxes semiannually, and federal income taxes on a schedule less frequent than monthly. As a result, Mountain Bell has the use of funds collected from ratepayers for various periods before these moneys must be disbursed to pay taxes. In its newly filed tariffs, Mountain Bell included $21,112,000 in its rate base for *positive* working capital. This amount was derived by calculating one-twelfth of its annual operating expenses less depreciation. In other words,

Mountain Bell postulated a one-month lag between payment of all expenses and receipt of the corresponding revenues. It stated that positive working capital allowances had been attributed to Bell telephone companies by regulatory authorities in thirty-one states, and zero or negative working capital had been attributed in eleven states. A positive working capital allowance using the same formula utilized in deriving the newly-filed Colorado tariffs had been granted to Mountain Bell in Texas and Wyoming, and denied in Montana.

Evidence of Mountain Bell's working capital requirement was also offered by a management consultant testifying on behalf of Colorado Ski Country USA and the Colorado-Wyoming Hotel and Motel Association, Inc., who reported on the results of his balance sheet analysis. Working from Mountain Bell's monthly balance sheets, he subtracted assets not recognized in the rate base from liabilities not assigned a specific cost in rate-of-return calculations. This resulted in a *negative* working capital figure of $6,216,000. In his opinion this was the proper way to calculate the working capital requirement because it included every use and source of working capital. *See, e.g., Wash. Util. & Transp. Comm'n v. Puget Sound Power & Light Co.*, 45 PUR4th 605, 612 (Wash. Util. & Transp. Comm'n 1982); *Re Determination of Rate Base and Working Capital Allowance*, 43 PUR4th 402 (Fla.Pub.Serv.Comm'n [hereinafter cited as PSC] 1981). The witness noted that Bell telephone companies in six areas used the balance sheet approach in calculating their own working capital requirements. He concluded that Mountain Bell's request for positive working capital should be denied. He characterized this recommendation as conservative, and said that the PUC could reduce the rate base by $6,126,000 for negative working capital if it were so inclined.

The PUC staff recommended to the PUC that Mountain Bell's request for an allowance for positive working capital be rejected. Utilizing data concerning Mountain Bell's average advance billings, property taxes, and federal income taxes, the staff estimated that Mountain Bell had average advance payments of $30,271,000 available for its use to offset its asserted $21,112,000 cash working capital needs. Thus, this approach yielded a *negative* working capital estimate of $9,159,000. Nevertheless, the staff did not recommend a negative working capital allowance. It explained,

> [i]nasmuch as [Mountain Bell] has not conducted a lead-lag study for this proceeding, the Staff could not determine the precise dollar amount of accrued taxes and advanced billings, and therefore hesitates to recommend a negative cash working capital allowance. Staff is aware that not all of the total amount of advanced billings are collected in advance. However, without a lead-lag study, the amount is indeterminable.

Record at 1951.

A "lead-lag study" empirically identifies the difference in timing between outward cash flow for labor, materials and supplies, inventory, and other expenses, and inward cash flow from charges to customers. *See Cent. La. Elec. Co., Inc. v. La. Pub. Serv. Comm'n*, 373 So.2d 123, 130 (La.1979). The staff called it the best justification for a working capital allowance. *See Re Pub. Serv. Elec. & Gas Co.*, 46 PUR4th 322, 328 (N.J.Bd.Pub.Util.1982).

The PUC eliminated the positive working capital allowance proposed by Mountain Bell from the rate base, without imposing a negative allowance. It explained the elimination by noting, as the staff did, that Mountain Bell had not considered the effect of advance billings and accrued taxes on working capital needs and that no lead-lag study had been conducted.[1]

---

1. The PUC's extensive findings were as follows: We agree with the staff's negative adjustment of $21,112,000 to eliminate cash working capital from Mountain Bell's rate base. Mountain Bell did not demonstrate its need for cash working capital in the rate base except simply to state that cash is required for the day-to-day operations of the business and that cash working capital funds are a property used and useful in providing service. Mountain Bell

The decision of the PUC on this issue is in accordance with the testimony of the staff and took cognizance of all the evidence in the record. The findings of fact satisfactorily support the attribution of zero working capital to Mountain Bell.

An objection to rate base based on failure to attribute negative working capital to Mountain Bell also was raised by the League in the 1968 telephone rate case, *Colo. Mun. League v. PUC*, 172 Colo. 188, 473 P.2d 960 (1970). There, the League argued that negative working capital should be recognized, but proposed that it be used to offset materials and supplies in the rate base rather than be subtracted directly. (The result is the same; the rate base would be reduced.) This court held that "the allowance of [materials and supplies without an offset for negative working capital] is within the Commission's judgment and discretion; it is beyond our purview." *Id.* 172 Colo. at 206, 473 P.2d at 968. The League asserts that the record in the present case contains more evidence of negative working capital than did the proceedings in *Colo. Mun. League v. PUC*, but the PUC adopted the staff's view that it could not determine the amount of negative working capital, if any, without a lead-lag study. It was within the PUC's discretion to reach this conclusion. Therefore, we affirm on the issue of working capital.

## II.

The League points to evidence in the record that the annualization of test year wage increases, which raised Mountain Bell's test year expenses and revenue requirements by $5,703,000, was partially offset by the annualization of test year productivity increases. It claims that the PUC erred in failing to make findings justifying annualization of wage increases without annualizing productivity increases.

An historical test period establishes the relationships between revenue, costs and investment for a utility. These relationships are generally constant and reliable, forming the basis for calculating fair and reasonable rates. *Mountain States Tel. & Tel. Co. v. PUC*, 182 Colo. 269, 275–76, 513 P.2d 721, 724 (1973). Rates are determined by calculating what levels would have yielded enough revenue to cover expenses plus a reasonable return on investment, i.e., rate base, during the test period.

There are two methods of determining revenue, costs, and rate base within an annual test period. Under the first, or averaging method, rate base is averaged throughout the year, utilizing monthly or other periodic figures, and the actual, unadjusted revenues and costs are determined.

---

proposed that an appropriate cash working capital allowance be one-twelfth of the total operating expenses (less depreciation).

We agree that an allowance for cash working capital may be justified when it can be demonstrated that a lag exists between the outward cash flow of the utility for labor, materials and supplies, inventory, etc., and the inward cash flow from rates. The methodology normally used to demonstrate such a need for cash working capital is a lead-lag study which identifies the existing deficiency between the incurrence of expenses and collection of revenues associated with these expenses. Mountain Bell did not conduct a lead-lag study in support of its proposed cash working capital allowance of one-twelfth of the total annual operating expenses. Furthermore, Mountain Bell did not consider the benefits of the revenues that it receives from accrued taxes in developing its cash working capital allowance. There is a significant lag between the collection of the funds for accrued taxes and

the payment of those taxes to the taxing authority as was demonstrated by staff witness Fleming. It should also be recognized that Mountain Bell bills its customers in advance for most local exchange services which it provides. As an example of this impact, for the six-month period from January, 1979, through June, 1979, Mountain Bell's billing averaged $19,227,000 on an intrastate basis. If the commission were to utilize the customary formula of deducting one-half of the property taxes (which one-half would be $9,388,000) and one-third of the federal income taxes (which one-third would be $1,656,000) from the requested cash working capital allowance, together with the advance billings of $19,227,000, a total deduction of $30,271,000 would exist. On these premises, we find that Mountain Bell has not justified a cash working capital allowance in its rate base and that the staff's elimination of the same is proper. *Re Mountain States Tel. & Tel. Co.,* 39 PUR4th at 234–35.

This has the advantages of reducing the impact of seasonal and non-recurring phenomena on the relationships involved. The second, the year-end method, ascertains revenue, cost and rate base at the end of the test period and annualizes revenues and costs based on the year-end figures. It has the advantage of employing only the most recent data to determine the relationships involved. In selecting between methods, the goal is to achieve reasonably reliable results. *See Re Michigan Bell Tel. Co.*, 94 PUR3d 321, 325 (Mich. PSC 1972).

The PUC recognized this objective in explaining its use of the averaging method to determine the rate base in the 1968 telephone rate case:

> The revenues and expenses and the resulting net operating earnings for a year are, of course, accumulated month by month and are in fact average figures for the year rather than an annualization of the revenues and expenses as of the last day of the period. For proper matching of revenues, expenses, and rate base, it is then also necessary, in our view, to determine the proper rate base on a month-to-month basis and use an average figure. To use the year-end rate base would distort this relationship.

*Re Mountain States Tel. & Tel. Co.*, 76 PUR3d 481, 494 (Colo. PUC 1969).[2]

Other utility regulatory authorities have echoed the concern that juxtaposing average figures and year-end figures produces distortion. They have criticized proposed adjustments annualizing the effect of a single change within the test period, which would convert one isolated average figure to a year-end figure. "A test year is used to determine the company's financial performance during a known past period so that its future revenue requirements can be ascertained. We cannot logically adjust one element of that past performance to reflect future events, without adjusting all other elements." *Re Potomac Electric*

*Power Co.*, 64 PUR3d 364, 369 (D.C. PSC 1966).

> Although it is sometimes said that the test-year results should be adjusted for "known" changes, this is a superficial statement of the basis for adjustment.... [W]e "know" that expenses will increase in each year. We also "know," however, that revenues will increase each year and that net earnings will increase in each year. An adjustment is called for, therefore, only when we "know" that a change has occurred that is different from the change which has occasioned increases in all of these quantities on an annual basis. In other words, an adjustment is called for when the change is in the relative patterns of growth of expenses, revenue, and plant.

*Re New England Tel. & Tel. Co.*, 84 PUR3d 130, 163–64 (Mass.Dept.Pub.Util. [hereinafter DPU] 1970). *See also Re Southwestern Bell Tel. Co.*, 27 PUR4th 493, 512 (Ark. PSC 1979) (" '[A] mismatching of ratemaking components occurs if expenses are not used in combination with revenues from the same time period....' To obtain an accurate picture ... we must use revenues and expenses from a contemporaneous period of time.") (quoting earlier Commission order).

 Courts reviewing the orders of utility regulatory authorities have also expressed solicitude for preserving the integrity of the test period data against one-sided adjustments. "It is fundamental to a proper test year that costs (both investment and operating) and revenues match, i.e., that they be consistent with each other. Unless there is a matching of costs and revenues, the test year is not a proper one for fixing just and reasonable rates." *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 605 (Iowa 1971) (quoting Commission order with approval). Ordinarily, if adjustments anticipating increases in expenses are considered by the PUC, anticipated increases in reve-

---

**2.** In citing this earlier PUC order, we note that the PUC is not bound by the doctrine of *stare decisis;* the mere fact that a prior order may appear inconsistent does not in itself render the present one arbitrary or capricious. *B & M Service, Inc. v. PUC,* 163 Colo. 228, 429 P.2d 293 (1967).

nue should also be considered. *Gen. Tel. Co. v. Mich. Pub. Serv. Comm'n,* 78 Mich. App. 528, 539, 260 N.W.2d 874, 879 (1977).

In the present case, the rates requested by Mountain Bell reflected annualization of all wage increases occurring during the test year.[3] This adjustment raised expenses, and therefore revenue requirements, by $5,703,000.

■ This court has approved the use of the historical relationship between test year investments, revenues and expenses as a basis for calculating the rates necessary to assure utilities a fair rate of return. We have also recognized that adjustments to the test period data, including annualization of known changes occurring during the test period which *affect the relationships* between investment, revenues and expenses must sometimes be made. *Mountain States Tel. & Tel. Co. v. PUC,* 182 Colo. at 276, 513 P.2d at 724. If all changes within the test period are annualized, then the test period data are converted from average to year-end. Generally, this court will not question the PUC's decision whether to use either the averaging method or the year-end method to ascertain test year figures. *See New England Tel. & Tel. Co. v. DPU,* 360 Mass. 443, 450–53, 275 N.E.2d 493, 499–501 (1971); *cf. Colo. Ute Elec. Ass'n v. PUC,* 198 Colo. 534, 539–40, 602 P.2d 861, 864 (1979) (court will not question PUC's method of making out-of-period adjustments unless it is inherently unsound). However, we have cautioned against arbitrary distortion of test-year relationships:

> [W]age and salary increases [effective after the test period] may not exceed to any large extent the usual consequent increase in the productivity of the employees. *If* they do, which is generally

the case in periods of uncontrolled inflation, then such out-of-period adjustment must be reckoned with in the rate fixing procedure.

*Mountain States Tel. & Tel. Co. v. PUC,* 182 Colo. at 276, 513 P.2d at 724 (emphasis added). This is equally true for wage increases effective during the test period, because a wage increase that is fully matched by a productivity increase, or some other change, has no effect on the relationships between investment, revenues and expenses that the test year serves to establish.

■ In substance, what the PUC has done here is employ year-end test period figures for wages, the largest element of operating·expenses, and average test period data for almost everything else.[4] This raises Mountain Bell's revenue requirement by $5,703,000 a year. We recognize that "a blind adherence ... to the relationship between costs, revenue and average investment in the historic test period without weighing the factors involved with proper in-period and out-of-period adjustments would be erroneous." *Mountain States Tel. & Tel. Co. v. PUC,* 182 Colo. at 276–77, 513 P.2d at 724–25. The PUC has considerable discretion in its choice of means to fix rates. *Colo. Ute Elec. Ass'n v. PUC,* 198 Colo. at 539, 602 P.2d at 864. However, this particular choice would appear to constitute an abuse of discretion.

This conclusion is fortified by comparing the PUC's action to the decisions of other utility regulatory authorities on this issue. It is true that annualization of wage increases has sometimes been allowed when the regulatory authority found that the increases were not offset by other changes in the test period,[5] when those other changes were explicitly found to be unmea-

3. Management employees received a raise on January 1, 1979. Both "craft and clerical" and "supervisory and technical" employees were given raises toward the end of the test period, the former effective on August 5, 1979, the latter on October 1, 1979. The test period ran from November 1, 1978, through October 31, 1979.

4. The PUC also accepted Mountain Bell's annualization of pension and tax increases, deprecia-

tion represcription and debt cost adjustment. These amounts were much smaller than the wage increase, and were not challenged on appeal.

5. *Re Pac. Tel. & Tel. Co.,* 95 PUR3d 1, 12 (Cal. PUC 1972); *Ex Parte South Central Bell Tel. Co.,* 87 PUR3d 498, 514 (La. PSC 1971) (PSC not convinced that productivity increase sufficient to offset wage increases); *Re Appalachian Pow-*

surable,[6] or when other key figures were also annualized, converting the test period data from average to year-end.[7] None of these cases support the action of the PUC in the present case.

The majority of regulatory authorities facing this issue have either rejected annualization of wage increases,[8] or adjusted the annualization to reflect other test period changes.[9] An annualization of wage increases put forth by Mountain Bell itself was rejected in Montana. *Re Mountain States Tel. & Tel. Co.*, 23 PUR3d 233, 246 (Mont. PSC 1958), *aff'd*, 135 Mont. 170, 338 P.2d 1044 (1959). As the California Public Utilities Commission has explained,

> ... wage rates by themselves do not produce increased labor costs. The num-

ber of employees, composition of the force, salary level, and operating forces, the state of technology, extent of construction, and overtime policy, as well as other factors, acting together result in the total wage bill. It is not enough to look at only wage rates or expenses in considering test-year results of operations. Trends in earnings and trends in revenues in relation to expenses and to net plant are also important factors, among others, to consider.... We find that to [annualize test year wage increases] without at the same time giving effect to the offsetting effects resulting from growth in revenues and operating economies and efficiencies, so unbalances the revenue-expense-plant relationship in

er Co., 38 PUR4th 73, 81–82 (W.Va. PSC 1980); *but see City of Los Angeles v. PUC*, 7 Cal.3d 331, 347, 497 P.2d 785, 797, 102 Cal.Rptr. 313, 325, *on remand Re Pac. Tel. & Tel. Co.*, 95 PUR3d 1 (Cal. PUC 1972).

6. *Re Niagara Mohawk Power Corp.*, 35 PUR3d 149, 164–65 (N.Y. PSC 1960); *Re New England Tel. & Tel. Co.*, 99 PUR3d 228, 230 (R.I. PUC 1973), *aff'd sub nom. R.I. Consumers' Council v. Smith*, 113 R.I. 232, 319 A.2d 643 [6 PUR4th 17] (1974) (no probative evidence); *Wash. Util. & Transp. Comm'n v. Pac. N.W. Bell Tel. Co.*, 51 PUR4th 335, 349 (Wash. Util. & Transp. Comm'n 1983); *Re Wheeling Elec. Co.*, 9 PUR4th 448, 455 (W.Va. PSC 1975); *see Re N.W. Pub. Serv. Co.*, 297 N.W.2d 462, 470–71 (S.D.1980), *rev'g* 18 PUR4th 291, 302–03 (S.D. PUC 1976); *but see Re Midstate Tel. Co.*, 10 PUR4th 88, 90–91 (N.Y. PSC 1975) ("any productivity adjustment is speculative, [but] it is equally speculative to conclude by implication that no increase in productivity can be expected").

7. *Re Pac. Gas & Elec. Co.*, 87 PUR3d 270, 290–92 (Cal. PUC 1971); *Re Cincinnati Gas & Elec. Co.*, 42 PUR4th 252, 270–73 (Ohio PUC 1981); *Pa. PUC v. Columbia Gas of Pa., Inc.*, 60 PUR3d 385, 411 (Pa. PUC 1965), *aff'd sub nom. City of Pittsburgh v. Pa. PUC*, 208 Pa.Super. 260, 274–75, 222 A.2d 395, 403 [65 PUR3d 257, 265–66] (1966); *Pa. PUC v. Gen. Tel. Co. of Pa.*, 28 PUR3d 413, 431–32 (Pa. PUC 1959); *Re Southern Bell Tel. & Tel. Co.*, 35 PUR4th 1, 33, 37 (S.C. PSC 1980) (net operating income annualized); *but see Pa. PUC v. Bell Tel. Co. of Pa.*, 52 PUR4th 85, 104–09 (Pa. PUC 1983) ("[T]he company's proposed wage annualization for the in-period wage increases has not properly reflected productivity as an offsetting factor. Consequently, the choice is to reject the company's proposed

adjustment as overstated by some unquantified (but significant) amount, or alternatively to accept it, as reduced or offset by an indirect adjustment methodology." 52 PUR4th at 107–08).

8. *Re Union Elec. Co.*, 47 FPC 144, 149–51, 94 PUR3d 87, 90–92 (1972); *Re Gen. Tel. Co. of Cal.*, 80 PUR3d 2, 54–56 (Cal. PUC 1969); *Re Pac. Tel. & Tel. Co.*, 53 PUR3d 513, 570–77 (Cal. PUC 1964); *Re Potomac Elec. Power Co.*, 64 PUR3d 364, 368–69 (D.C. PSC 1966); *Re Inter-County Tel. & Tel. Co.*, 33 PUR3d 287, 292 (Fla. R.R. & PUC 1960); *Re Mountain States Tel. & Tel. Co.*, 23 PUR3d 233, 246 (Mont. PSC 1958), *aff'd*, 135 Mont. 170, 338 P.2d 1044 (1959); *Re Otter Tail Power Co.*, 21 PUR4th 254, 270–71 (S.D. PUC 1977), *rev'd on other grounds*, 291 N.W.2d 291 (S.D.1980); *Wash. PSC v. West Coast Tel. Co.*, 27 PUR3d 238, 250 (Wash. PSC 1959); *cf. Re Dayton Power & Light Co.*, 29 PUR4th 145, 165–66 (Ohio PUC 1979), *aff'd*, 61 Ohio St.2d 215, 217–18, 400 N.E.2d 396, 398 (1980) (no annualization of wage increases that are not contractually required); *contra United Gas Corp. v. Miss. PSC*, 240 Miss. 405, 127 So.2d 404, 416–17 [38 PUR3d 252, 266–67] (1961).

9. *Re New England Tel. & Tel. Co.*, 11 PUR4th 297, 304–05 (Mass. DPU 1975), *rev'd on other grounds*, 371 Mass. 67, 74–75, 354 N.E.2d 860, 865–66 (1976); *Re New England Tel. & Tel. Co.*, 84 PUR3d 130, 163–65 (Mass. DPU 1970), *aff'd in part and rev'd in part*, 360 Mass. 443, 450–53, 490–92, 275 N.E.2d 493, 499–501, 521–22 (1971); *Re Mich. Bell Tel. Co.*, 85 PUR3d 467, 478–82 (Mich. PSC 1970); *Re Mich. Consol. Gas Co.*, 36 PUR3d 289, 303 (Mich. PSC 1960); *Re N.J. Bell Tel. Co.*, 78 PUR NS 97, 103–05 (N.J. PUC 1949); *Re Midstate Tel. Co.*, 10 PUR4th 88, 90–91 (N.Y. PSC 1975); *Re Narragansett Elec. Co.*, 93 PUR3d 417, 442 (R.I. PUC 1972).

the test-year results of operations as to render [Pacific Bell's] adjusted test-year results of operations meaningless for rate-fixing purposes.

*Re Pac. Tel. & Tel. Co.*, 53 PUR3d 513, 572, 576–77 (Cal. PUC 1964), *aff'd on this issue and partially annulled on other grounds*, 62 Cal.2d 634, 674, 44 Cal.Rptr. 1, 26, 401 P.2d 353, 378 (1965) (footnote omitted). *Accord Re Gen. Tel. Co. of Cal.*, 80 PUR3d 2, 56 (Cal. PUC 1969) ("The staff argues that if one expense increase is annualized, then all increases in revenue, expenses, and rate base should also be annualized. The staff argument is sound. One expense should not be considered without also considering effects of all other items comprising revenues and expenses.") The California PUC reaffirmed this view more recently in *Re Pac. Tel. & Tel. Co.*, 83 Cal. PUC 149 (1977).

■ We conclude that annualization of test period wage increases alone strongly suggests that the PUC has abused its discretion, rather than regularly pursuing its authority. We must, however, compare what the PUC has said to what it has done to ascertain whether it has made findings justifying this irregular action. The only indication in its order that the PUC impliedly adopted the annualization of wage increases and impliedly rejected any productivity offset is the incorporation by reference of Mountain Bell's income statement. There is no finding whether the wage increases unbalanced the relationships between investment, revenues and expenses. This is insufficient. As the California Supreme Court has held, "[the California PUC] may adjust all figures, revenue, expense, and investment for anticipated changes but it may not adjust one side or part of the equation without adjusting the other *unless there is a finding that the particular expenditure is extraordinary.*" *City of Los Angeles v. PUC*, 7 Cal.3d 331, 347, 497 P.2d 785, 797, 102 Cal.Rptr. 313, 325 (1972) (emphasis added). *Accord*

*Citizens of Fla. v. Hawkins*, 356 So.2d 254, 255–58 (Fla.1978); *City of Miami v. Fla. PSC*, 208 So.2d 249, 258 (Fla.1968).

■ Mountain Bell casts this issue as turning upon the credibility and weight of testimony before the Commission. We disagree. The critical defect in the PUC's order is the absence of adequate findings supporting its decision to annualize in-period wage increases without annualizing other components of expense and revenue. The question of whether the order of the PUC is supported by adequate findings of fact is a question of law. *See PUC v. Northwest Water Corp.*, 168 Colo. 154, 169–70, 451 P.2d 266, 273–74 (1969).

■ A review of the relevant testimony before the Commission emphasizes the need for factual findings in order to enable us to evaluate the appropriateness of the annualization of in-period increases. The Colorado Ski Country consultant calculated that annualization of historical productivity gains would offset the proposed annualization of wage increases by $3,389,000, or fifty-nine percent. He recommended that the PUC adopt this offset. Mountain Bell included a productivity offset for its proposed adjustment covering wage increases effective *after* the test period, but no offset for those effective during the test period. (The PUC rejected the post-test period wage increase adjustment.)[10]

Mountain Bell's district staff manager testified that Mountain Bell had not annualized productivity gains as an offset to annualization of test period wage increases "because all of the productivity that would have been experienced has been experienced in the test year." Record of May 21, 1980, hearing at 272. Mountain Bell's argument rests primarily on this statement by the district staff manager. In context, it becomes apparent that this is more an estimation of the legal effect of our holding in *Mountain States Tel. & Tel. Co. v. PUC*, 182 Colo. 269, 513 P.2d 721 (1973), that

---

**10.** The PUC's extensive findings on the proposed post-test period adjustment appear at 39 PUR4th at 240–41. They include the observation, with apparent agreement, that the Colorado Ski Country consultant "pointed out ... that Mountain Bell could offset completely any 1980 wage increase by productivity gains." *Id.* at 241.

productivity gains generally must be offset against out-of-period wage increases, than a statement of fact or an expert opinion.[11] A similar situation arose in *Denver & S.L. R.R. Co. v. Chicago, B. & Q. R.R. Co.*, 64 Colo. 229, 171 P. 74 (1918). There this court reviewed the record and found that:

> The conflict, if any, is in the conclusions drawn [from undisputed facts] by the witnesses, which, instead of being testimony, is simply their deductions as to the legal effect of the evidence concerning the real facts, which are not in dispute. These deductions were for the Commission to make, and are questions of law rather than of fact. We admit that there is a conflict in the deductions of these different witnesses.... Such matters were but reasons or arguments as to what they thought ought to follow.

*Id.* 64 Colo. at 237–38, 171 P. at 77. The court held that the PUC had erred as a matter of law, and reversed its order. Here too, highly selective annualization without explanatory findings of fact is an error of law, and the reasoning or argument of the Mountain Bell witness does not mitigate this error. Therefore, we must reverse the order and remand the cause.

We offer no guidance to the PUC in the resolution of this issue, except to say that its order is arbitrary and capricious in annualizing test period wage increases with no accompanying adjustment or offset for other changes in absence of adequate findings of fact.

### III.

The League asserts that the PUC erred, after finding that Mountain Bell's test period earnings exceeded its revenue requirement by $506,000, by failing to order a rate reduction. The PUC's findings were as follows:

> [O]n a test year pro forma basis Mountain Bell's earnings exceeded its revenue requirement by $506,000. In view of the fact that the test year excess earnings of $506,000 is [sic] de minimus in relation to the overall revenue requirement, the commission believes that it would be inappropriate to attempt to "spread" any revenue "reduction" of such a relatively insignificant amount. It should also be recognized that calculating a revenue requirement is not a matter of scientific precision, but the exercise of sound regulatory judgement. With the economic decline now being experienced in such sectors as housing, for example, it readily can be surmised that the economic downturn very likely will eliminate any minimal surplus revenues Mountain Bell will experience.

39 PUR4th at 257.

It appears that the PUC relied on three considerations in reaching this result. First, it found that "$506,000 is de minimus in relation to the overall revenue requirement...." Second, it believed that "it would be inappropriate to attempt to 'spread' any revenue 'reduction' of such a relatively insignificant amount"; in other words, inaction would avoid the costs associated with rate modification. Finally, it found that "the economic downturn very likely will eliminate any minimal surplus revenues."

---

11. The relevant testimony was as follows:

Q. You would make no productivity offset in calculating that adjustment [for test period wage increases], isn't that correct?
A. That's correct, because all of the productivity that would have been experienced has been experienced in the test year.
Q. That's correct. Let's say that instead of that [wage increase] going into effect on October 1 [during the test period], that it went into effect on November 1, 1979 [the day after the end of the test period]. Now, you have to make an out of period adjustment, wouldn't you?

A. That would be—yes, that would be considered, I believe by this Commission to be an out of period adjustment.
Q. And you would, following the Commission's dictates of the past, you would make a productivity offset?
A. [Yes.] And I would like to emphasize, "following the Commission's dictates."

"The Commission's dictates" apparently arise from the passage in *Mountain States Tel. & Tel. Co. v. PUC*, 182 Colo. at 276, 513 P.2d at 724, quoted *supra* p. 17.

The League disputes the characterization of the $506,000 difference as *de minimus*. It claims that a rate reduction of this amount is necessary to avoid unjust, unreasonable charges. It argues that general statements about the economy by the PUC cannot justify allowing Mountain Bell to retain excess earnings, and in any event these statements are unsupported by the record.

Since we have held that the PUC improperly computed Mountain Bell's revenue requirement by annualizing wage increases only, unsupported by adequate factual findings, it is possible that the difference between revenue requirement and earnings will no longer be $506,000 in the order that the PUC enters on remand. Nevertheless, the PUC will again face the choice between discounting the difference between revenue requirement and earnings, or setting in motion some procedure to modify earnings. Therefore, we elect to address this issue.

The issue of what constitutes a *de minimus* difference between revenue requirement and earnings in a rate proceeding is one of first impression for this court. We have reviewed decisions arising from PUC ratemaking in which far less was at stake without characterizing the amount as *de minimus*. *See, e.g., Colo. Ute Elec. Ass'n v. PUC,* 198 Colo. 534, 541, 602 P.2d 861, 865–866 (1979) (PUC's exclusion of $8,868 membership dues and fees from test year expenses not arbitrary or capricious). However, it apparently was not argued in those cases that the amount at stake was *de minimus.* Three other factors are material in the present case: the PUC has ruled the amount in question to be *de minimus,* the difference is the final result of the exercise of regulatory judgment rather than an intermediate stage in that process, and holding the amount in question not to be *de minimus* would require setting in motion the machinery of earnings modification. Hence, notwithstanding our past consideration of smaller amounts in question, we are free to consider afresh in the present context whether the $506,000 in excess revenues is *de minimus.*

The parties have brought to our attention authorities from other jurisdictions concerning what is considered *de minimus.* We have not found the authorities from outside the ratemaking context instructive. With regard to ratemaking, the appellees rely on *Bristol County Water Co. v. Harsch,* 120 R.I. 223, 386 A.2d 1103 (1978), where the court found that the Rhode Island PUC had made two errors in the calculation of revenue requirement and earnings, but held that "it would hardly pay the cost of the service company's cranking up its computers to include this pittance within all its bills." *Id.* at 230, 386 A.2d at 1107. The amount in question there appears to have been a one-time charge of approximately $700 spread across all the customers of a wholly-owned subsidiary whose parent company had assets valued at over $851 million. *Id.* at 224, 386 A.2d at 1104. Because of the minuscule amount involved there, the *Bristol County* case appears inapposite. *See also Watergate Improvement Associates v. PSC,* 326 A.2d 778, 791 n. 30 (D.C.1974) (difference of $517 between profits generated by new rates and those produced by old rates accepted as *de minimus* ); *State ex rel. Util. Comm'n v. Va. Elec. & Power Co.,* 285 N.C. 398, 416, 206 S.E.2d 283, 296 (1974) (error in calculation of rate base reducing revenue requirement by $6200 alone would not justify rate increase, but may be taken into account in further proceedings). We note that while no party to the present proceedings has indicated what it would cost to "crank up" Mountain Bell's computers, Mountain Bell was allowed to retain $71,000 from interest accruing on a refund to offset the costs of making the refund in *Mountain States Tel. & Tel. Co. v. PUC,* 180 Colo. 74, 86, 502 P.2d 945, 951 (1972). This is far less than the $504,000 per year at issue here.

In *City of Miami v. Fla. PSC,* 208 So.2d 249 (Fla.1968), the court held *de minimus* an amount approximating the same magnitude as the amount at issue here. The court held a mathematical error of $108,356 in excess earnings, in the context of a revenue requirement of approximately $44

million, "de minimus under the 'end result' rule on the theory that it may have helped offset possible mistakes unfavorable to the Company." *Id.* at 257. *See also Minn. Power & Light Co. v. Minn. PSC*, 310 N.W.2d 686, 693 (Minn.1981) (error of two percent in tax rate on gross earnings spanning six months of test period is insufficient to require reversal).

While we have reservations about the reasoning of the court in *Miami*, we agree that the PUC's characterization of the difference between revenue requirement and earnings as *de minimus* must be examined in the context of the exercise of its judgment in the ratemaking proceeding. The greatest degree of judgment on the part of the PUC is required in determining the fair return on equity, because there the PUC must not merely choose between two alternatives, as it often does in making the decisions determining rate base, expenses and revenues, but rather from a range of alternatives. *See Colorado Municipal League v. PUC*, 172 Colo. 188, 210, 473 P.2d 960, 971 (1970). It is for this reason that we have held that the PUC's decision on return on equity will not be disturbed as long as it falls within a "zone of reasonableness." *Mountain States Tel. & Tel. Co. v. PUC*, 186 Colo. 260, 266, 527 P.2d 524, 527 (1974). Excess revenues ultimately accrue to shareholders. Hence we choose to analyze the *de minimus* issue in the context of the accuracy of selection of a fair return on equity.

In the present case, the PUC determined that a fair rate of return on common equity was 13.3%. It was thus claiming accuracy of no greater than one-tenth of one percent in setting the rate of return on Mountain Bell equity, which constituted

41.7% of the $946,269,000 rate base, or approximately $394,000,000.[12] An error of one-tenth of one percent of this amount would be $394,000. The PUC's determination was based on testimony generally implying less exactness than one-tenth of one percent.[13]

In the context of the accuracy of the rate of return figure, we hold that the PUC's characterization of $506,000 of excess revenues in the test period as *de minimus* is marginally acceptable. While we would not characterize this as an "insignificant amount," we agree that reversal for this reason alone would impose an artificial pseudoscientific precision on the ratemaking process. *See City of Montrose v. PUC*, 629 P.2d 619 (Colo.1981).

Because we hold that the PUC's characterization of the $506,000 difference between revenue requirement and earnings falls short of compelling reversal, we need not consider whether its generalized economic observations could justify the same result. Our holding is intended to provide guidance to the PUC in acting on the difference between revenue requirement and earnings when this difference is determined on remand.

## IV.

We affirm the judgment with respect to the negative working capital and *de minimus* issues, reverse as to the annualization issue, and remand this case to the district court, which shall set aside the order of the PUC and shall direct the PUC to conduct further proceedings consistent with this opinion.

QUINN, J., does not participate.

---

12. 76.97% (equity share of AT & T capital) × 46.34% (AT & T share of Mountain Bell capital) + 5.99% (minority share of Mountain Bell capital) = 41.7%. *See* 39 PUR4th at 253.

13. The following ranges of fair rates of return on common equity were recommended to the PUC:
 (a) Wilson (Mountain Bell)—15 to 18.5 percent
 (b) Meyer (Mountain Bell)—16.2 to 18.3 percent
 (c) Langsam (Gen.Serv.Admin.)—12.5 to 13.5 percent
 (d) Kosh (League)—13.25 percent
 (e) Karahalios (PUC staff)—12.8 to 13.8 percent
39 PUR4th at 249–50.